******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* FERNANDO V.*
(AC 37464)

Keller, Prescott and Mullins, Js.

*Argued October 20—officially released December 27, 2016*

(Appeal from Superior Court, judicial district of
Stamford-Norwalk, geographical area number twenty,
Holden, J.)

*Mary A. Beattie*, assigned counsel, for the appellant (defendant).

*Denise B. Smoker*, senior assistant state's attorney,
with whom, on the brief, were *Richard J. Colangelo*, *Jr.*,
state's attorney, and *Nadia C. Prinz*, assistant state's
attorney, for the appellee (state).

*Opinion*

PRESCOTT, J. The defendant, Fernando V., appeals from the judgment of conviction, rendered following a jury trial, of one count of sexual assault in the second degree in violation of General Statutes § 53a-71 (a) (1), one count of sexual assault in the second degree in violation of General Statutes § 53a-71 (a) (4), and two counts of risk of injury to a child in violation of General Statutes § 53-21 (a) (2). The defendant claims on appeal that the trial court improperly precluded him from presenting testimony from the complainant's boyfriend of four years. In particular, the defendant argues that the boyfriend's testimony was relevant to counter the state's evidence that she had become more withdrawn or exhibited other characteristics generally associated with sexually abused young adults, as testified to by the state's expert witness, as well as to impeach testimony that the defendant had tried to prevent the complainant from associating with boys of her own age. We agree that the boyfriend's testimony improperly was excluded by the court and that its exclusion was not harmless error under the circumstances of this case. Accordingly, we reverse the judgment of conviction and order a new trial.[1]

The jury reasonably could have found the following facts. When the complainant, B, was nine years old, she moved from Mexico to Stamford to live with her mother and the defendant, her stepfather.[2] At that time, B's younger brother, grandmother, and uncle also lived with B's mother and the defendant. The grandmother, however, soon returned to Mexico, and B was alone more frequently with the defendant because her mother and uncle were working. When B was approximately twelve years old, the defendant, on more than one occasion, touched her breasts, sometimes putting his hand inside of B's shirt and sometimes touching her over her shirt. B confided in her mother that the defendant was "trying to touch" her breasts. B's mother confronted the defendant, but he denied any inappropriate behavior, and nothing further came of the matter.

When she was thirteen, the family moved to a condominium that the defendant and B's mother had purchased in Norwalk. B's mother began to work more hours, and B's brother often would play outside with friends, leaving B alone with the defendant. The defendant continued to touch B as he had while in Stamford, but he also began to have sexual intercourse with B. The first time the defendant engaged in intercourse with B, he was intoxicated and made her go into the bathroom. He told her he wanted to "do it this one time," unbuckled his pants, and inserted his penis inside B's vagina.

After that first incident, the defendant continued to touch B inappropriately or have penile-vaginal sexual

intercourse with B several times a month. The assaults generally occurred in his bedroom. On most occasions, the defendant was sober and promised B that it would be the last time. The assaults continued, however, until B was seventeen years old. After the defendant began having intercourse with B, B did not tell her mother about the assaults because B was afraid of how her mother would react, namely, that her mother would blame B. At some point, however, B's mother confronted B about whether the defendant had "made [B] have sex with him," and B fully disclosed the details of the assaults to her mother at that time.

B's mother contacted the police, and, following an investigation, the defendant was arrested and charged. A jury found the defendant guilty of two counts of sexual assault in the second degree and two counts of risk of injury to a child. He received a total effective sentence of ten years of incarceration, followed by ten years of special parole. This appeal followed.

The defendant claims on appeal that the court improperly precluded him from presenting testimony from B's longtime boyfriend, P. According to the defendant, P's testimony was relevant to demonstrate that B had not exhibited any behavioral characteristics or changes in personality consistent with those sometimes exhibited by sexual assault victims, as described to the jury by an expert witness offered by the state. The defendant maintains that the testimony also was admissible to contradict aspects of the testimony given by B and her mother, both of whose credibility was central to the state's case against him. The defendant argues that the court abused its discretion by excluding the testimony from the jury without a proper basis for doing so, and that the error was not harmless because the excluded testimony, if presented to the jury, could have had a substantial impact on the verdict. The state, by contrast, asserts that P's testimony was offered solely as extrinsic evidence for impeachment purposes, and that the court properly excluded the proffered testimony because it was both collateral in nature and entirely consistent with the testimony given by B and her mother. We agree with the defendant that P's testimony was improperly excluded by the court and that its exclusion was not harmless error.[3]

The following additional facts are relevant to our resolution of the defendant's claim. During its case-in-chief, the state presented testimony from a number of witnesses. With respect to the issues before us on appeal, the relevant testimony came from the state's expert witness on child sexual abuse and delayed disclosure, B, and B's mother.

The state's expert witness, Larry M. Rosenberg, was a licensed psychologist and clinical director of the Child Guidance Center of Southern Connecticut, an outpatient mental health clinic for children and adolescents.

In addition to testifying on the topic of delayed disclosure in sexual assault cases, Rosenberg was asked by the state to describe general behavioral characteristics that often are associated with sexual assault victims. Specifically, during the state's examination of Rosenberg, the state asked whether there were general behavioral characteristics associated with teenagers and young adults who disclose sexual abuse. This colloquy followed:

"[Rosenberg]: Well, if you were going to ask me, the—in the majority of cases, being sexually abused tends to most—most typically, but not always, reduce the level of functioning of the person who has been victimized. So, most typically, you see changes in their behavior, but not always. It depends on how—the level at which they were functioning previously.

"[The Prosecutor]: And do symptoms of trauma always occur within a given time frame after a disclosure or after the traumatic incident itself?

"[Rosenberg]: No. The diagnostic manual for the mental health profession is specific about this, that post-traumatic symptoms can occur as much—as many as years following a traumatic event occurring.

\* \* \*

"[The Prosecutor]: What are some symptoms of trauma from child sexual assault, that you've seen, in your practice, with victims who have made a disclosure?

"[Rosenberg]: I previously mentioned disassociation, the kind of psychic numbing that can go on. In a more technical term, you know, depersonalization. Sort of stepping outside of yourself, not recognizing, sort of, be feeling a part of who you are anymore. That you're not the same person.

"But in addition to that, typically, symptoms would be bad dreams, flashbacks of the events that had occurred, recurring memories of the event that had occurred, changes in functioning with regard to sleep, with regard to cognitive functioning, with regard to school functioning.

"*Withdraw*[*al*] *is common*. Depression is common. Heightened anxiety, particularly in the face of anything that is reminiscent of the event. But likewise, anything that's reminiscent of the event can cause the person not necessarily to become overtly anxious, but to manifest that anxiety by becoming more withdrawn and more numb than they had been previously. And those are some of the findings, typically." (Emphasis added.)

The mother testified during her direct examination that she had observed some behavioral changes in B, specifically indicating that, in the year prior to the defendant's arrest, B became more withdrawn than usual and would stay in her room more often. She reiter-

ated those observations on cross-examination, indicating that when B was sixteen or seventeen years old, she "stay[ed] in her room more often, locked up." Both B and her mother testified that she continued to do well in school, continued to participate in activities that she enjoyed, such as playing the flute and reading, and worked part-time without any significant difficulties or interruptions.

In addition to eliciting testimony regarding B's personality and behavioral characteristics during the time period of the alleged assaults, the state also questioned B and her mother regarding the defendant's behavior toward B's male friends.[4]

B explained that, beginning in her freshman year of high school, the defendant would get angry if she tried to "hang out" with male friends. He would make her hang up the telephone if he discovered her talking to a boy, and would question her about the conversation.[5] Defense counsel was able to counter this testimony in part during his cross-examination of B, eliciting from B that she had dated two boys during high school, including one during her freshman year, and that the defendant had not objected to her dating either boy and had no issues with them.[6]

Similarly, during its examination of B's mother, the state also inquired whether the defendant was "any different with regard to [B's] friends as girls or her friends as boys?" B's mother responded in the affirmative and, when asked how he was different, she stated, consistent with B's direct testimony: "Well, like, he didn't like for her to go out with male friends." On cross-examination, the following exchange occurred:

"[Defense Counsel]: Now, you also testified that [the defendant] had some issues with [B] talking to boys. Is that correct?

"[The Mother]: Yes.

"[Defense Counsel]: How old was [B] when he raised these concerns?

"[The Mother]: Well, she was already in high school. The same, sixteen, seventeen, where she wanted to go out more and he was against that.

"[Defense Counsel]: But isn't it true that your daughter actually did have a boyfriend in freshman year in high school?

"[The Mother]: Yes.

"[The Prosecutor]: Objection.

"The Court: Objection's overruled. Isn't it true? Yes, is the answer. The answer may stand.

"[Defense Counsel]: And [the defendant] never opposed that relationship. Isn't that true?

"[The Mother]: Well, he wouldn't allow any friends

to show up at the house.

"[Defense Counsel]: Did you ever witness [the defendant] forbid this boy from coming to the home, ever?

"[The Mother]: Well, yes. Once, when it was her birthday, we celebrated her eighteenth birthday and we invited boys and girl friends, and he showed up and he was very upset, asking why they were still at the house and it was 10 at night.

"[Defense Counsel]: But what I'm talking about . . . is, [the defendant] really did not object to her having a boyfriend in freshman year in high school, and you didn't witness him come between that relationship, at all, did you?

"[The Mother]: No. . . .

"[Defense Counsel]: Isn't it true that in [B]'s second year in high school, she got into a relationship with a second boy, his name [was P]. Isn't that correct?"

At this point, the state objected on the ground of relevancy and on the ground that the line of questioning was precluded by our rape shield statute. See General Statutes § 54-86f. The court asked defense counsel to explain this line of questioning and whether it went to the mother's credibility. Defense counsel answered that it did go to the mother's credibility, but also to the specific conduct of the defendant. The court overruled the state's objection but instructed defense counsel that it did not want to get "bogged down in collateral issues." The court instructed the mother to answer the question, and the mother's testimony resumed as follows:

"[The Mother]: Yes.

"[Defense Counsel]: And they—and she's still in this relationship with this boy. Isn't that correct?

"[The Mother]: Yes.

"[Defense Counsel]: And this relationship's been going on since second year in high school, correct?

"[The Mother]: Yes."

On redirect, the state asked B's mother if the defendant was aware that B had a boyfriend in high school, to which the mother answered: "Yes, I believe so."

During his presentation of evidence, the defendant attempted to call as a witness B's longtime boyfriend, P. Just a few questions into the defendant's direct examination of P, defense counsel asked P how he knew B, and P answered that they had been in a relationship for the past four years. At that point, the court, sua sponte, excused the jury. The court stated to counsel that it was "not trying collateral matters" but indicated to counsel that it would entertain an offer of proof. The following testimony was then heard outside of the presence of the jury:

"[Defense Counsel]: When you say you're in a relationship, are you—do you consider yourself boyfriend and girlfriend?

"[P]: Yes.

"[Defense Counsel]: And have you continuously gone out with her, or been in a relationship with her, as boyfriend and girlfriend, for four years?

"[P]: Yes I have.

"[Defense Counsel]: Have there been any breaks in the relationship?

"[P]: No, there have not.

"[Defense Counsel]: Now, in the time period that you've been going out, as boyfriend and girlfriend, with [B], have you noticed any significant behavioral issues with her?

"[P]: No, not really.

"[Defense Counsel]: Have you noticed any pronounced eating disorders?

"[P]: No, I have not.

"[Defense Counsel]: Have you noticed any suicidal thoughts?

"[P]: No, I have not.

"[Defense Counsel]: Have you noticed any severe depression?

"[P]: No, I have not.

"[Defense Counsel]: Have you noticed any eating disorders?

"[P]: No, I have not.

"[Defense Counsel]: Have you noticed any anger or outbursts or violence, by her?

"[P]: No, I have not.

"[Defense Counsel]: Have you noticed any trouble with her focusing on issues or tasks at hand?

"[P]: No, I have not.

"[Defense Counsel]: And, to your knowledge, do you know if her grades have slipped, in any way, in the four years you've known her?

"[P]: No, I don't think so.

"[Defense Counsel]: And, in the four years that you've known her, have you noticed any type of interruption in her playing of the flute?

"[P]: No, I have not.

"[Defense Counsel]: And, since September, 2011, have you noticed any of the things that I just mentioned, occurring with [B]?

"[P]: No, I have not.

"[Defense Counsel]: And, did [the defendant] ever forbid you from dating [B]?

"[P]: No, he never did.

"[Defense Counsel]: Did [the defendant] ever forbid you from talking to [B]?

"[P]: No, he never did.

"[Defense Counsel]: Did [the defendant] ever forbid you from seeing [B]?

"[P]: No, he never did.

"[Defense Counsel]: Did [the defendant] ever forbid you from being alone with [B]?

"[P]: No, he never did."

The state indicated to the court that it objected to the entirety of P's proffered testimony. According to the state, the testimony was not "relevant to the issue at hand," and it questioned whether P, as a layperson, was "able to detect the signs of many of the kinds of disorders counsel asked him about." The court inquired of the state whether P's testimony impeached anyone else's testimony, recalling that B herself had testified that she was attending school, getting good grades, and still playing the flute. The court also stated that it did not recall any testimony "of any disorders." The state responded that P's testimony was not inconsistent with any other testimony. The court asked defense counsel: "Is some fundamental basis going to be—fundamental questions going to be asked of him to determine whether or not he's able to even discern those issues you raised? Behavior disorders?" Defense counsel offered the following response to the state's objection and to the court's inquiries:

"Yes, no, Your Honor, they go to, basically [P's] impression as being in a relationship with [B], whether or not he's noticed behavioral changes in [B]. And that goes to impeach—it goes to the credibility of the—what was testified to by [B's mother], slightly of—that she said her daughter, and there was a question, by the state, of [B's mother], whether she noticed any type of depression in her daughter. And I believe [she] answered in the positive. So, it goes to impeach [B's mother's] statement, number one.

"I would also submit to Your Honor that there's been information, by the expert of the state, which, basically, has testified as an expert, that certain behavioral issues come up when there [are] allegations made by alleged victims.

"And [P] can testify whether he's seen those, or not, as [a] layperson. Not as an expert. But as somebody who's in a relationship with her.

"The only thing else I would add, Your Honor, is apart from that, the questions that I asked regarding [the defendant] directly go to testimony that has been made by both [B] and [B's mother] with respect to [the defendant] objecting to [B] having any sort of relationship, of any kind, with male persons.

"And here is a young man who's in a relationship, for four years, who has testified that no such negativity he has seen from [the defendant]."

In responding to defense counsel's offer of proof, the state reiterated that it did not believe that P's testimony directly contradicted anything that B or her mother had stated in their testimony, and reasserted that it was prejudicial to allow the defense to introduce any evidence of a relationship or relationship history into the case regardless of the defendant's purported rationale for pursuing it. The court then issued its ruling as set forth in the following colloquy:

"The Court: Anything further, counsel? This is extrinsic evidence to impeach one, whether or not [the defendant] discouraged [P] from having a relationship with his daughter? That's correct?

"[Defense Counsel]: Correct, that's part of it.

"The Court: And whether or not he saw anything that—in terms of behavior, that has been testified to as—may or may not be common with certain individuals. And you want that to come in, into evidence, as well, through this witness?

"[Defense Counsel]: Correct, Your Honor.

"The Court: Anything further?

"[Defense Counsel]: No, Your Honor.

"The Court: The relevance of this testimony, the court finds similar to that last testimony, is collateral, at best.[7]

"Impeachment is not, by this evidence, extrinsic evidence. It lends itself to—it's likely to confuse the jurors. *It's not probative of any issues*.

"And the testimony is clear, on the record, regarding whether they believe the testimony of the mother and the complainant as to the relationship in terms of with boys.

"And she testified she had been in a relationship for four years. She has a boyfriend. She testified to that. That's before the jury already. That was—that's there. I don't see any impeachment, based upon what I've heard on this record, counsel.

"Offer of proof has been made. It's on the record, should the matter be reviewed. It's there for the Appellate Court to look at.

"But before the jury, it's confusing. *It's not probative*, and counsel, the objection is sustained." (Emphasis

added; footnote added.) P's proffered testimony was not presented to the jury.

During its rebuttal closing argument, the state reminded the jury that it had heard evidence that B became more withdrawn before the defendant's arrest, and that she was spending more time in her room. The state also recounted Rosenberg's testimony that behavioral symptoms resulting from sexual assaults do not always manifest themselves contemporaneously with the assault.

We begin our analysis by setting forth our standard of review as well as legal principles pertinent to our consideration of the defendant's claim. "We review the trial court's decision to admit [or exclude] evidence, if premised on a correct view of the law . . . for an abuse of discretion. . . . We will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion. . . . The trial court has wide discretion to determine the relevancy [and admissibility] of evidence . . . ." (Internal quotation marks omitted.) *State* v. *Alex B.*, 150 Conn. App. 584, 593, 90 A.3d 1078, cert. denied, 312 Conn. 924, 94 A.3d 1202 (2014).

Generally, "[e]vidence is admissible [if] it tends to establish a fact in issue or to corroborate other direct evidence in the case. . . . Unless excluded by some rule or principle of law, any fact may be proved which logically tends to aid the trier in the determination of the issue." (Internal quotation marks omitted.) *State* v. *McClendon*, 199 Conn. 5, 8–9, 505 A.2d 685 (1986); see also Conn. Code Evid. § 4-2 ("[a]ll relevant evidence is admissible, except as otherwise provided by the constitution of the United States, the constitution of this state, the [Connecticut] Code [of Evidence] or the General Statutes").

"The testimony of any witness may be contradicted by the testimony of any other witness." (Internal quotation marks omitted.) *State* v. *Warren*, 14 Conn. App. 688, 699, 544 A.2d 209, cert. denied, 209 Conn. 805, 548 A.2d 442 (1988), cert. denied, 488 U.S. 1030, 109 S. Ct. 839, 102 L. Ed. 2d 971 (1989). Thus, "[a] witness may be impeached by the introduction of contradictory evidence of other witnesses as long as the evidence is in fact contradictory . . . and that evidence does not relate to a collateral matter. . . . A contradiction is not collateral if it is relevant to a material issue in the case apart from its tendency to contradict a witness. . . . Whether extrinsic evidence contradicts testimony of a witness so as to require its introduction into evidence for impeachment purposes is within the trial court's discretion, subject to review only for abuse of discretion." (Citations omitted; internal quotation marks omitted.) *State* v. *Smith*, 49 Conn. App. 252, 258–59, 714 A.2d 1243, cert. denied, 247 Conn. 914, 722 A.2d 809 (1998); see also *State* v. *Carbone*, 172 Conn. 242, 262,

374 A.2d 215 (impeaching witness on collateral matter by extrinsic evidence not allowed), cert. denied, 431 U.S. 967, 97 S. Ct. 2925, 53 L. Ed. 2d 1063 (1977).

Before turning to our review of the court's ruling in the present case, we first address the theory of admissibility relied on by defense counsel in seeking to admit P's testimony. The theory of admissibility is germane to our consideration of whether the court properly exercised its discretion to exclude the proffered testimony on the basis of a correct view of the law. "An appellant who challenges on appeal a trial court's exclusion of evidence is limited to the theory of admissibility that was raised before and ruled upon by the trial court. A court cannot be said to have refused improperly to admit evidence during a trial if the specific grounds for admission on which the proponent relies never were presented to the court when the evidence was offered. . . . Error does not lie in the exclusion of evidence claimed on an inadmissible ground even though it might have been admissible had it been claimed on another and different ground [at trial]." (Citations omitted; internal quotation marks omitted.) *State* v. *Polynice*, 164 Conn. App. 390, 401, 133 A.3d 952, cert. denied, 321 Conn. 914, 136 A.3d 1274 (2016).

In its appellate brief and at oral argument before this court, the state attempted to persuade us that P's testimony was offered and rejected solely as impeachment evidence, purportedly to contradict the testimony given by B, B's mother, or the state's child sexual abuse expert. According to the state, P's testimony as proffered was wholly consistent with the testimony given by B and her mother, and in no way conflicted with the testimony of its expert, who testified as to the general behavioral characteristics of victims of sexual abuse, but who also testified that such characteristics were not always present. The state insists that the court properly ruled that P's testimony was inadmissible for impeachment purposes. To the extent that the state suggests that the defendant's theory of admissibility was so limited in scope, we disagree.

As the defendant has consistently maintained, both on appeal and before the trial court, he expressly sought to admit P's testimony as direct evidence, both in response to testimony by the state's expert regarding potential behavioral characteristics often exhibited by sexual assault victims and to counter testimony by B's mother that B became withdrawn and stayed in her room more often. The court was aware that the defendant had a dual-pronged theory for the admissibility of P's testimony, and acknowledged as much on the record. Specifically, the court asked defense counsel if he was offering the testimony as extrinsic evidence to impeach testimony that the defendant had discouraged B's relationship with P. Defense counsel answered yes, "*in part*," suggesting that P's testimony was contradic-

tory in other ways. (Emphasis added.) More importantly, the court also inquired whether defense counsel sought to admit P's testimony as direct evidence of B's behavior. Defense counsel answered in the affirmative. Thus, rather than being offered solely for impeachment purposes as the state asserts, P's testimony was offered, in large part, as direct evidence of B's behavior, and the court clearly understood that the evidence was being offered for more than impeachment purposes.[8] With that in mind, we turn to our review of the court's rationale for excluding P's testimony.

The court stated several reasons on the record for excluding P's testimony, all of which are belied by the record and the particular circumstances of this case. First, the court appears to have accepted the state's representation that P's testimony was not, in fact, contradictory of any prior testimony and also indicated that the testimony was "collateral, at best" and, thus, inadmissible as extrinsic evidence to impeach. The court also stated several times that P's testimony was "not probative of any issue," suggesting the court failed to grasp its relevance, which was clearly significant. In this case, in which there was no third party witness to the alleged abuse, no inculpatory statements by the defendant, and no forensic evidence, the state's case against the defendant rested almost entirely on the jury's assessment of the credibility of B and her mother. The state admitted as much in its closing argument, telling the jury that "what this case really comes down to is one simple question: who do you believe?" Such evidence cannot properly be viewed either as collateral in nature or not probative of the central issue of this case. The trial court's conclusions to the contrary simply are unfounded.

It is indisputable that by questioning B and her mother about B's behavior and by eliciting testimony from its expert witness about the behavioral characteristics oftentimes displayed by sexual assault victims, the state opened the door to the defendant's proffered evidence. The state cannot have it both ways: on the one hand introducing its own evidence of B's behavior favorable to the state's case and, on the other, seeking to prevent the defendant from presenting his own contrary evidence. B's mother provided otherwise unrebutted testimony that B was more withdrawn than usual and stayed locked up in her room. The state then elicited testimony from Rosenberg that withdrawal was common among sexual assault victims, thereby giving damning context to the mother's observation. The defendant was entitled to produce his own witness in an effort to counter the state's evidence and demonstrate that B had not exhibited any behavioral characteristics that could be associated with sexual assault victims. That witness was P. Although P was not qualified to give an expert medical opinion about B, he could competently testify as a layperson about her observable actions and behav-

iors, or lack thereof, and the jury was capable of assessing his observations in that light. Furthermore, although P was never directly asked during the proffer whether B had become more withdrawn, the overall nature of the questions asked, including whether B continued to participate at a high level in school and engage in regular activities, were probative of B's level of engagement in normal activities generally and, if presented to the jury, P's responses could have raised reasonable doubt in the minds of the jury about whether B had become withdrawn. The court excluded relevant and material testimony from the jury by its wholesale exclusion of P's testimony.

It is true that P's proffered testimony could be viewed, in part, as corroborative of B's and her mother's testimony. For example, all three indicated that B had done well in school and maintained social activities. Both B and her mother, however, also testified that the defendant acted differently when it came to B's male friends. Although neither testified that the defendant had any negative interactions with respect to P in particular, P's testimony nonetheless was probative of the issue of whether the defendant had acted in a negative fashion toward B having male friends generally because P indisputably was a close male friend of B. P indicated that, over a period of four years, the defendant had never stopped P from talking to B, from being alone with B, or from dating B. P was not asked to opine during the proffer about the defendant's reaction to other male friends. Nevertheless, the jury reasonably could have inferred from P's positive interactions with the defendant that the negative reaction the defendant allegedly exhibited toward male friends of B, as testified to by B and her mother, was less likely to be true. P's testimony, therefore, although not directly contradicting the testimony of B and her mother that the defendant did not like B to associate with boys of her own age, provided a contrasting perspective that could have aided the jury in assessing the defendant's attitude toward male friends. Furthermore, P's testimony, taken as a whole, suggested no negative changes in B's behavior, which was in contrast to B's mother's testimony that she had become withdrawn and stayed in her room.

If impeachment had been the sole purpose offered for admitting P's testimony, the court's ruling excluding that testimony may not have risen to an abuse of discretion because its probative value for that purpose was somewhat attenuated, entitling the decision to exclude it to greater deference. We acknowledge, after all, that there was a somewhat loose fit between P's testimony about his own treatment by the defendant as B's boyfriend, and the testimony of B and her mother regarding the defendant's attitude toward male friends generally. Additionally, the defense was able to introduce through cross-examination the fact that B had boyfriends in high school and that the defendant was aware of them and

had "no issues" with them. P's testimony might also have been deemed somewhat cumulative in that regard, although that was not one of the bases provided by the court for excluding the testimony. See Conn. Code Evid. § 4-3 (proper to exclude relevant evidence if its admission would cause "undue delay, waste of time or needless presentation of cumulative evidence"); but see *State* v. *Little*, 138 Conn. App. 106, 122, 50 A.3d 360 (care should be taken not to exclude evidence that merely overlaps with previously received evidence), cert. denied, 307 Conn. 935, 56 A.3d 713 (2012).

Nevertheless, as we have discussed, P's testimony was also offered for, and relevant to, the issue of whether B had exhibited behaviors associated with some sexual assault victims, which had a clear and direct bearing on the central issue before the jury, namely, whether B had been sexually assaulted by the defendant. The court chose not to limit the scope of P's testimony, but simply precluded his testimony in its entirety. In excluding P's testimony, the court also suggested that it would have been confusing to the jury. It is axiomatic that the court has discretion to exclude even relevant evidence when its probative value is outweighed by the danger of confusion of the issues or misleading the jury. See Conn. Code Evid. § 4-3. The proffered testimony, however, involved short answers to concise questions about his interaction with and observations of B as her boyfriend. As we have explained, in a "he said, she said" type case such as this, B's actions and behavior were central to the jury's assessment of the evidence, which in large part consisted of B's testimony. There is nothing in P's testimony as proffered that was difficult to understand in the context of the material issues, and, thus, presented little or no danger of confusing or misleading the jury. For all of these reasons, we conclude that the exclusion of P's testimony was an abuse of discretion.

Having determined that the court improperly excluded P's testimony, we turn to whether that error was harmful. "In order to establish reversible error on an evidentiary impropriety . . . the defendant must prove both an abuse of discretion and a harm that resulted from such abuse. . . . [T]he proper standard for determining whether an erroneous evidentiary ruling is harmless should be whether the jury's verdict was substantially swayed by the error. . . . Accordingly, a nonconstitutional error is harmless when an appellate court has a fair assurance that the error did not substantially affect the verdict." (Citation omitted; internal quotation marks omitted.) *State* v. *Alex B.*, supra, 150 Conn. App. 593. "[W]hether [an improper ruling] is harmless in a particular case depends upon a number of factors, such as the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on mate-

rial points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case. . . . Most importantly, we must examine the impact of the . . . evidence on the trier of fact and the result of the trial." (Internal quotation marks omitted.) *State* v. *Eleck*, 314 Conn. 123, 129, 100 A.3d 817 (2014). In other words, if the court improperly excludes evidence that, if admitted, may have tended substantially to influence the jury in light of the particular circumstances of that case, the error cannot be considered harmless. See *State* v. *Wilson*, 308 Conn. 412, 426, 64 A.3d 91 (2013).

P's testimony was important to the defense to the extent that it helped to paint B as having been an ordinary high school girl. Any evidence tending to show that B failed to exhibit behaviors often attributed to sexual assault victims or that dissuaded the jury from believing B's story generally, by implication, necessarily would also decrease the likelihood in the eyes of the jury that an assault had occurred.

Moreover, we agree with the defendant that the state's case here was not an exceedingly strong one. As previously stated, there was no corroborating physical evidence or any witnesses to the alleged sexual assaults. The case turned largely on whether the jury believed B, and our review of her direct testimony and cross-examination reveals many internal inconsistencies and a lack of details. Moreover, the state injected behavioral characteristics as an issue in the case through its expert, Rosenberg, and the state was permitted to offer corroborating evidence through B's mother that B was withdrawn, one of the characteristics that Rosenberg specifically indicated was common in sexual abuse victims. P, who knew B well for many years, was the only witness offered by the defendant to counter the mother's testimony, and, as such, exclusion of his testimony certainly was damaging to the defense. The state in its brief has offered little analysis with respect to harmless error, simply restating its position that P's testimony "did not differ materially from that of B or her mother" and arguing that exclusion of the testimony "had little effect on the jury, which had already heard about B's high school boyfriends, her good grades and her activities." The state fails to address P's testimony as it pertains to B's behavioral characteristics, which we have already established was a significant issue before the jury, largely because of how the state chose to prosecute this case. For example, the state chose to highlight the mother's testimony that B had become "withdrawn" to the jury during closing arguments, reminding the jury of the expert's testimony and that withdrawal was a common characteristic of a sexual assault victim. On the basis of our review of the record as a whole as well as the evidence presented at trial, we do not have a fair assurance that the court's exclusion of relevant evidence favorable to the defense did not

substantially affect the verdict.

The judgment is reversed and the case remanded for a new trial.

In this opinion the other judges concurred.

* In accordance with our policy of protecting the privacy interests of the victims of sexual abuse and the crime of risk of injury to a child, we decline to use the defendant's full name or to identify the complainant or others through whom the complainant's identity may be ascertained. See General Statutes § 54-86e.

[1] The defendant also claims on appeal that he was deprived of a fair trial because the prosecutor referred to the complainant as a "survivor" during the state's rebuttal closing argument. Because we reverse the judgment of conviction and order a new trial on the basis of the defendant's evidentiary claim, we do not reach the defendant's prosecutorial impropriety claim, which is not likely to arise on retrial. See *State* v. *T.R.D.*, 286 Conn. 191, 195, 942 A.2d 1000 (2008).

[2] The defendant married B's mother prior to B coming to the United States, and he later adopted B and helped her petition for permanent residency.

[3] As part of his claim, the defendant also asserts that the court's evidentiary error deprived him of his constitutional right to present a defense as protected by the sixth and fourteenth amendments to the United States constitution, and article first, § 8, of the Connecticut constitution. Because we agree with the defendant that the court abused its discretion in excluding the boyfriend's testimony, the error was not harmless, and the defendant is entitled to a new trial, we do not address the constitutional aspect of the defendant's claim. See *State* v. *Genotti*, 220 Conn. 796, 804, 601 A.2d 1013 (1992) (courts ordinarily should exercise restraint and eschew unnecessary determinations of constitutional issues).

[4] Presumably, the state sought to have the jury infer that any negative behavior by the defendant regarding B's interaction with male friends demonstrated jealousy or that he was sexually possessive of B, either of which, if believed, tended to make the sexual assault allegations against the defendant more believable.

[5] B testified as follows:

"[The Prosecutor]: Did—as this was all occurring, did his behavior toward you change, in any other ways?

"[B]: His behavior?

"[The Prosecutor]: You know, the way he was with you, you know, in the house or about school—just anything, you know, because you were living together all this time, right?

"[B]: Mm-hmm.

"[The Prosecutor]: So, anything else about your relationship that changed, along with all this?

"[B]: I wouldn't, like, be able to hang out with guy friends because he would—he wouldn't like it, he would get mad.

"[The Prosecutor]: So—can you describe that, a little bit more?

"[B]: Like, if—let's say, like, if he thought maybe I was talking on the phone and he was a guy, he would make me hang up or he would ask questions on why I was talking to a guy. When, like, if I talked to a girl, it wouldn't really matter.

"[The Prosecutor]: And how old do you think you were, when that started?

"[B]: Maybe freshman year of high school.

"[The Prosecutor]: How old were you your freshman year?

"[B]: Fourteen, fifteen."

[6] The relevant colloquy on cross-examination was as follows:

"[Defense Counsel]: . . . Now, you stated that [the defendant] didn't allow you—would get upset if you had boyfriends or male friends. Is that correct?

"[B]: Yes.

"[Defense Counsel]: When did that—when did you notice that to start? How old were you?

"[B]: I think it started in high school.

"[Defense Counsel]: What grade were you in, in high school, when you perceived this type of reaction from [the defendant]?

"[B]: I think I was a freshman.

"[Defense Counsel]: Did he actually say anything to you?

"[B]: He would just get mad. Like, if I was talking on the phone, he would be, like—he would ask me who it was and if I said a boy, he was, like, well,

why are you talking to him.

"[Defense Counsel]: Besides that, did he say anything further?

"[B]: No.

"[Defense Counsel]: Would he say anything further?

"[B]: No, not that I remember.

"[Defense Counsel]: Would he speak to you, after the phone call, more extensively about that?

"[B]: No.

"[Defense Counsel]: Isn't it true that you had a boyfriend your freshman year in high school?

"[B]: No, sophomore year.

"[Defense Counsel]: You didn't date a [NV]?

"[B]: Well, yeah, for a short period of time.

"[Defense Counsel]: But you dated him, correct?

"[B]: Yes.

"[Defense Counsel]: And you dated him in freshman year in high school, correct?

"[B]: Yes.

"[Defense Counsel]: And why did you break up with him?

"[B]: It just wasn't working out.

"[Defense Counsel]: Was—it wasn't working out between you and [NV]—

"[The Prosecutor]: Objection. What's the relevance of a prior romantic relationship?

"The Court: Sustained. Next question please.

"[Defense Counsel]: After that relationship, did you have another boyfriend, after that?

"[The Prosecutor]: Objection. I would renew the objection, Your Honor.

"[Defense Counsel]: May I be heard, Your Honor?

"The Court: Objection is sustained. Next question.

"[Defense Counsel]: Did [the defendant] object to [NV], at all?

"[B]: No.

"[Defense Counsel]: Did [The defendant] ever have any issues with any current boyfriends you have or have had, after that?

"[B]: No."

[7] P was the second witness the defense attempted to call. The court was referring to the defendant's first witness, the employer of B's mother, JV, who, in addition to employing her for many years, had befriended her and helped her out in various circumstances. Except for some preliminary information, the court also heard JV's testimony outside the presence of the jury. The testimony presented focused primarily on whether JV had contacted a lawyer on behalf of B's mother for the purpose of obtaining money from the defendant in exchange for B not testifying in this case. JV denied this allegation, which denial was entirely consistent with testimony elicited from B's mother during her cross-examination. When the court questioned the purpose for JV's testimony, defense counsel stated that he wanted "to challenge the veracity of [JV's] answers." The court refused to allow the jury to hear JV's testimony. The court explained that the defendant was bound by JV's answers, which corroborated rather than contradicted the testimony by B's mother, and it concluded that the testimony was both confusing and collateral in nature.

[8] The defendant acknowledges that he also sought to admit P's testimony partly for impeachment purposes because P's testimony was contrary to the testimony by B and her mother that the defendant had acted in a negative fashion toward B's relationships with male friends, in addition to conflicting with testimony by B's mother that B had exhibited behavioral changes. As we have previously indicated, if the jurors believed B and her mother regarding the defendant's alleged behavior toward B's male friends, they might reasonably have inferred that the defendant's behavior manifested some sexual obsession with B or, alternatively, demonstrated his concern that a close relationship with a boy might result in a disclosure of his criminal acts, either of which would tend to corroborate B's allegations of sexual abuse.