******************************************

The "officially released" date that appears near the be-
ginning of each opinion is the date the opinion will be pub-
lished in the Connecticut Law Journal or the date it was
released as a slip opinion. The operative date for the be-
ginning of all time periods for filing postopinion motions
and petitions for certification is the "officially released"
date appearing in the opinion.

All opinions are subject to modification and technical
correction prior to official publication in the Connecticut
Reports and Connecticut Appellate Reports. In the event of
discrepancies between the advance release version of an
opinion and the latest version appearing in the Connecticut
Law Journal and subsequently in the Connecticut Reports
or Connecticut Appellate Reports, the latest version is to
be considered authoritative.

The syllabus and procedural history accompanying the
opinion as it appears in the Connecticut Law Journal and
bound volumes of official reports are copyrighted by the
Secretary of the State, State of Connecticut, and may not
be reproduced and distributed without the express written
permission of the Commission on Official Legal Publica-
tions, Judicial Branch, State of Connecticut.
******************************************

ROBINSON, C. J., with whom KAHN, J., joins, dissenting. I respectfully disagree with the conclusion in part III of the majority opinion, which concludes that the Appellate Court properly determined that the trial court's exclusion of testimony from P, the longtime boyfriend of B, the victim in this case, requires reversal of the judgment of conviction rendered against B's stepfather, the defendant, Fernando V.[1] *State* v. *Fernando V.*, 170 Conn. App. 44, 153 A.3d 701 (2016). Even if the trial court improperly excluded P's testimony to the effect that B did not exhibit certain behaviors that may or may not be indicative of trauma from sexual abuse, I nevertheless have a fair assurance that this evidentiary error was harmless because it did not substantially sway the jury's verdict. I reach this conclusion particularly in light of circumstantial evidence corroborating B's allegations, the collateral nature of P's testimony, and the fact that other evidence—namely, the cross-examination testimony of B and her mother, G—provided support for the defendant's argument near-identical to that which would have been provided by P's testimony. Because I would reverse the judgment of the Appellate Court, I respectfully dissent.

I begin by noting my substantial agreement with the factual and procedural history recited in part I of the majority opinion. I also agree with part II of the majority opinion, which declines to consider the state's arguments that the trial court did not abuse its discretion when it precluded P from testifying.[2] Finally, I agree that, "[w]hen an improper evidentiary ruling is not constitutional in nature, the defendant bears the burden of demonstrating that the error was harmful. . . . [W]hether [an improper ruling] is harmless in a particular case depends upon a number of factors, such as the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case. . . . Most importantly, we must examine the impact of the . . . evidence on the trier of fact and the result of the trial. . . . [T]he proper standard for determining whether an erroneous evidentiary ruling is harmless should be whether the jury's verdict was substantially swayed by the error. . . . Accordingly, a nonconstitutional error is harmless when an appellate court has a fair assurance that the error did not substantially affect the verdict." (Internal quotation marks omitted.) *State* v. *Eleck*, 314 Conn. 123, 129, 100 A.3d 817 (2014); accord *State* v. *Ritrovato*, 280 Conn. 36, 56–57, 905 A.2d 1079 (2006) (discussing factors in context of exclusion of evidence). I part company from the major-

ity with respect to its application of these well settled principles to the record in the present case, and specifically its conclusion that the exclusion of P's testimony requires a new trial.[3]

Given the lack of physical evidence in the present case, I acknowledge that the defendant's theory of the case focused on impeaching the credibility of B, a theory borne out in his closing argument as he described her testimony as "inconsistent," "contradictory," "incomplete," and "noncorroborative evidence." See, e.g., *State* v. *Osimanti*, 299 Conn. 1, 20–21, 6 A.3d 790 (2010) (reviewing summations to discern significant factual issues in case). Beginning with the importance of P's proposed testimony to that defense, I note that P testified in an offer of proof that he had been in a relationship with B "continuously" over the preceding four years, with no breaks, and that he considered them to be "boyfriend and girlfriend . . . ." P testified that, over that four year period, he had not noticed "any significant behavioral issues" with B, nor any "pronounced eating disorders," "suicidal thoughts," "severe depression," "anger or outbursts or violence," or "trouble with her focusing on issues or tasks at hand . . . ."[4] P also did not think that B's grades had "slipped, in any way, in the four years [he had] known her," and he had not "noticed any type of interruption in her playing of the flute," which was her main extracurricular activity Finally, P denied that the defendant had ever forbidden him from "dating," "talking to," "seeing," or "being alone" with B. The defendant offered P's testimony for several reasons: (1) to establish whether he had seen "behavior that has been testified to [that] may or may not be common with certain individuals"; (2) to indicate the nature of B's relationship with the defendant; and (3) to impeach the testimony of B and G.

Given these arguments, P's proposed testimony must be understood in the context of the earlier testimony of the state's expert witness, Larry M. Rosenberg, who is the clinical director of the Child Guidance Center of Southern Connecticut, an outpatient mental health clinic. Rosenberg had testified about the concept of delayed disclosure of sexual abuse. In connection with that topic, Rosenberg also testified about behavioral signs of the trauma resulting from sexual assault—such as withdrawal, depression, sleep disturbances, and declines in cognitive and educational functioning. The defendant sought to use P's testimony to establish that B had not manifested those behavioral signs that Rosenberg had testified were consistent with the trauma of sexual abuse.

Although P's testimony might have been crucially important standing alone, its relative value in this case is significantly diminished for two reasons. First, whether a person shows behavioral signs of having been sexually abused is by no means definitive evidence on

that point. As Rosenberg testified during both direct and cross-examination, some sexual assault victims might show those trauma signs relatively soon, while other victims might never show any of those trauma signs. Some victims might experience no change in their ability to function in the near term, and might not manifest those signs until many years later, if at all.

Second, and more significantly, P's excluded testimony regarding the absence of these signs was consistent with that of B and G during both direct and cross-examination. B testified initially on direct examination that she had enrolled in college after graduating high school, and that she had maintained a grade point average of approximately 2.9 at both schools. She also testified that she had not experienced any lengthy absences from, or other problems at school or work because of behavioral or psychological reasons, noting that her only extended absence from high school was the result of a medical problem. B testified further that she was an active member of the college band, and that nothing had prevented her from pursuing that activity. B also contradicted her direct examination testimony that she was unable to have male friends, admitting that she had boyfriends during high school and that the defendant had not forbidden her from seeing them or having them as guests in the house.

G testified similarly, stating that there had been no changes in B's personality around the ages of twelve or thirteen years old, when the abuse escalated from improper touching to intercourse, because "she was always a little shy." Although G had testified on direct examination that the defendant was strict with respect to B's grades, and preferred her to go out with female rather than male friends, she also confirmed that B had boyfriends during high school, and that the defendant had not interfered with those relationships. Moreover, while G testified that, in the year prior to the defendant's arrest in this case, B had acted "more withdrawn and . . . that she would stay in her room," she then testified on cross-examination that B's activities had not changed, as she continued to enjoy reading and playing the flute from middle school into college. G also testified that B had always had a "timid" demeanor since coming to the United States as a child, and that it had not worsened during high school, although she would "stay in her room more often, locked up."

The testimony of B and G provided ample support for the defendant's theory of the case, even without P's similar testimony on point. In addition to emphasizing inconsistencies in the time, place, and nature of B's allegations,[5] the defendant's closing argument relied on the testimony of B and G to argue in detail that B had not manifested behaviors consistent with sexual abuse trauma. For example, defense counsel described as "contradictory" B's testimony on direct examination

that "she was unable to have guy friends," and that the defendant "didn't like her talking to boys," observing that she had "admitted" during cross-examination that "she did have two boyfriends during high school, and [that the defendant] never objected to her having these boyfriends. That he never forbade her . . . from seeing them, coming over to the house or in any way opposed to these relationships . . . ." Defense counsel also emphasized that B had not testified to any "effect on [her] grades," that she had "maintained a 2.9 through 3.0 consistently from middle school to college. She testified that her employment was never affected. There was no disruption in her extracurricular activities. She plays the flute, continues to play the flute. [G] also testified the same, that there was no changes, that [B] continued in those activities."

Defense counsel argued further that there was "no testimony by [B] that there was any behavioral changes. There's no testimony from [B] that she experienced any depression. No testimony from her that she experienced any suicidal ideations. No testimony that she experienced any eating disorders. No testimony from her that she had any violent tendencies. And more importantly, no evidence that after the alleged arrest of [the defendant], in 2011, did any of this come up. Which, as the State's own expert [witness] said, commonly is something that occurs. There's no evidence of any therapy or counseling ever received by [B]."

Turning to G's testimony, defense counsel argued that it was inconsistent with that of B, positing that G had "stated that [the defendant] did not like [B] talking to boys, but admitted [B] had boyfriends since freshman year in high school. And there was no evidence by [G] that [the defendant] ever objected to [B] having those relationships with those boys." Defense counsel further emphasized that G's "testimony is noncorroborative of [B's] in that she didn't see any behavioral issues with [B]. Claimed [B] was always a bit timid, even since she came to the [United States] and there was no alleged inappropriate behavior. And that there was really no change. Didn't see any of [B's] grades slip. Didn't see [B] stop playing the flute. And never saw any inappropriate behavior, whatsoever, during the entire time that they were together, between [B] and [the defendant]."

Defense counsel then compared this testimony by B and G to Rosenberg's testimony: "[Rosenberg] stated that it is more common to have some behavioral issues in alleged victims, especially in their adolescent years, and especially after the disclosure is made. He said it's common. It happens. But there's no evidence of any of that."

Similarly, defense counsel also argued that the testimony of Vicki Smetak, a Norwalk Hospital pediatrician who had examined B after her disclosure, was not corroborative. The defense argued that Smetak had made

"no physical findings of assault, whatsoever," and had stated "that there was no suicidal ideation or extreme behavioral issues that she noted during the exam."

I disagree with the majority's conclusion that, because "P's testimony was necessary for the jury to assess B's credibility," it therefore "cannot be harmless error to remove from the fact finder the very tools by which to make a credibility determination . . . ." (Internal quotation marks omitted.) That conclusion is belied by the record in the present case, insofar as the jury had numerous tools by which it could assess the credibility of B's allegations, all of which were well highlighted by the defendant's closing argument. Specifically, the cross-examination of B and G, along with Smetak's testimony, gave the defendant ample support for his behavioral arguments, even without P's testimony. Further, the persuasive value of the behavioral arguments is diminished by Rosenberg's testimony that signs of sexual abuse may or may not be present in victims in any event, rendering P's testimony not a significant addition to the evidence in the defendant's favor.

I also disagree with the majority's reliance on the lack of physical evidence in the present case in support of its conclusion that the improper exclusion of P's testimony was harmful because the state's case was not strong. I acknowledge that, "[a]lthough the absence of conclusive physical evidence of sexual abuse does not automatically render the state's case weak where the case involves a credibility contest between the victim and the defendant . . . a sexual assault case lacking physical evidence is not particularly strong, especially when the victim is a minor." (Citation omitted.) *State* v. *Ritrovato*, supra, 280 Conn. 57. In the present case, however, the state's case was significantly strengthened by other circumstantial evidence that corroborated B's testimony—namely, that D, B's half brother and the son of the defendant, had seen B and the defendant acting secretively on two separate occasions. Specifically, D, who was fourteen years old at the time of trial, testified that, on one occasion, he went to his parents' bedroom looking for the defendant, and that no one answered when he knocked on the door. When the door finally opened, he saw the defendant and B together in the room, with B putting her belt back on at that time. D also mentioned this incident in a statement to the police that the trial court admitted into evidence pursuant to *Whelan*.[6] In that document, D averred the following: "What I remember is that I went to look for my dad *but the room was locked*. I was just about to walk away and then I heard him call me and I just saw my sister putting on her belt." (Emphasis added.)

D's statement to the police also averred the following regarding a second incident: "I was . . . looking for

my dad and my sister told me he was in the garage. I just said ok because I already checked there. So I told my friend to walk downstairs and I stayed upstairs and all I saw was my dad leave my sisters room." In my view, D's testimony and statement significantly strengthened the state's case, as they provided the circumstantial smoke to the fire of B's testimony.[7] See *State* v. *Beavers*, 290 Conn. 386, 418–20, 963 A.2d 956 (2009) (improper arson expert testimony that fire was intentionally set, which was based on "assessment of the defendant's credibility," was harmless because of "enormity of the circumstantial evidence against the defendant, namely, the evidence of his motive, his opportunity, his knowledge that the fire started in the basement, his possession of fire starting supplies on the morning of the fire, his intent as shown through his prior bad acts, and the uncontroverted and properly admitted expert evidence that refuted his attempt to blame the fire on [his son's] smoking"); cf. *State* v. *William C.*, 267 Conn. 686, 709, 841 A.2d 1144 (2004) (noting that "distinct dearth of evidence corroborating the testimony of the victim, and the fact that the [excluded Department of Children and Families] records would serve to contradict her testimony, often through her own words, demonstrate that the state's case against the defendant was not particularly strong").

The harmlessness of the exclusion of P's testimony is even more apparent when the present case is considered in juxtaposition with those cases in which the central issue was the complainant's credibility and this court has found harmful evidentiary error to exist. First, P's proffered testimony did not pertain directly to the veracity of the complainant or the allegations themselves, but only to whether B had shown certain behaviors that Rosenberg had testified might—or might not be—present in a person experiencing the trauma of having been sexually assaulted. In contrast, cases where this court has found harmful evidentiary error involve improper evidence that more directly bolsters or undercuts the veracity of the complainant's testimony. See *State* v. *Favoccia*, 306 Conn. 770, 807–11, 51 A.3d 1002 (2012) (admission of improper expert testimony that indirectly vouched for teenage victim's credibility was harmful when there was evidence that "battered [victim's] veracity [and] would give any reasonable juror pause," including testimony by complainant's father "that he 'did not know whether to believe' her allegations against the defendant" because, as corroborated by testimony of his long-term girlfriend, it was factually impossible for victim's allegations to be true); *State* v. *Ritrovato*, supra, 280 Conn. 57–58 (improper preclusion of defendant from questioning victim about her claim of virginity was harmful when it pertained to her truthfulness and "this emotionally charged subject was mentioned repeatedly . . . during the state's case-in-chief" and, given lack of corroborating or physical evidence,

testimony on this subject "would have cast sufficient doubt on [victim's] credibility to have influenced the jury's verdict on the sexual assault charges"); *State* v. *Iban C.*, 275 Conn. 624, 641–45, 881 A.2d 1005 (2005) (improper expert bolstering via diagnosis of "child sexual abuse" was harmful as to one count of risk of injury to child in which "state's case rested almost entirely on the victim's credibility" with no physical or medical evidence, but was harmless with respect to second count of risk of injury to child, to which defendant had confessed); *State* v. *William C.*, supra, 267 Conn. 707–708 (improper exclusion of Department of Children and Families records was harmful because "the information contained in [those] records evince[d], if believed by the trier of fact, a pattern of vacillations with regard to the very allegations of abuse for which the defendant was standing trial," as well as victim's statements "that she would lie if she thought it necessary, and statements of the victim's physician as to the victim's capacity to distort reality and come to believe her distortions"); *State* v. *Grenier*, 257 Conn. 797, 806–808, 778 A.2d 159 (2001) (expert testimony that improperly described child victim's accusations as "very credible" was harmful in case with no physical or medical evidence, and no corroboration beyond constancy of accusation, because it "struck at the heart of the central—indeed, the only—issue in the case, namely, the relative credibility of [the victim] and the defendant" [internal quotation marks omitted]).

Finally, I observe there was no report of jury deadlock in this case to "indicate that the fact finder itself did not view the state's case against the defendant as particularly strong." *State* v. *Angel T.*, 292 Conn. 262, 294, 973 A.2d 1207 (2009); see also *State* v. *Favoccia*, supra, 306 Conn. 813–14 (concluding that deadlock followed by split verdict "indicates that the case was a close one in the eyes of the jury, making it more likely that the improper evidence might have tipped the balance"); *State* v. *Angel T.*, supra, 294 ("[t]he jury's deadlock in the present case renders more troubling its split verdict, following the Chip Smith charge, because the split verdict suggests that the jury had doubts concerning the victim's credibility as a general matter, as it failed to credit her testimony about the defendant's earlier attempts to molest her"). Instead, the jury in the present case returned a verdict of guilty on all counts after deliberating for several hours. In contrast to deadlock reports, this rapid verdict suggests that the trier of fact did not view this case as particularly close, an assessment with which I wholeheartedly agree.[8]

Because the exclusion of P's testimony was, at most, harmless error, I conclude that the Appellate Court improperly reversed the trial court's judgment of conviction. I would, therefore, reverse the judgment of the Appellate Court and remand the case to that court with direction to affirm.

Accordingly, I respectfully dissent.

[1] Specifically, the defendant was convicted, after a jury trial, of one count of sexual assault in the second degree in violation of General Statutes § 53a-71 (a) (1), one count of sexual assault in the second degree in violation of § 53a-71 (a) (4), and two counts of risk of injury to a child in violation of General Statutes § 53-21 (a) (2). See *State* v. *Fernando V.*, 170 Conn. App. 44, 46, 153 A.3d 701 (2016).

[2] The majority declines to consider the state's sole argument in this certified appeal in support of the trial court's evidentiary ruling, namely, that the trial court properly excluded P's testimony on the ground that it was cumulative of other evidence in the record, in part based on its conclusion that the state's claim is an unpreserved alternative ground for affirming the judgment of the trial court. As the state acknowledges, its arguments in support of excluding P's testimony have been somewhat of a moving target throughout this case. In its brief to this court, the state argues only that P's testimony was cumulative of that of B and G, which is an argument that it inaccurately contends that it raised in its Appellate Court brief as an *evidentiary* matter. In choosing to pursue this cumulativeness argument, the state appears to have abandoned the contentions that it made before the trial and Appellate Courts—namely, that P's testimony was not relevant, including for impeachment purposes, and that P lacked the expertise necessary to opine on whether B had shown any behavioral signs of sexual abuse trauma. See *State* v. *Fernando V.*, supra, 170 Conn. App. 62–63.

In declining to address the state's cumulativeness argument, the majority concludes that the state failed to preserve it before the trial court and, thus, may not now present it as an alternative ground on which to affirm the judgment of the trial court, insofar as whether evidence is cumulative is a discretionary determination, stating that "[w]e cannot determine whether the trial court abused an exercise of discretion that it neither made nor was asked to make." In declining to reach the state's claim, the majority links our well established cases holding that challenges to evidentiary rulings are limited to the grounds asserted before the trial court; see, e.g., *State* v. *Miranda*, 327 Conn. 451, 464–65, 174 A.3d 770 (2018); and that "[o]nly in [the] most exceptional circumstances can and will this court consider a claim, constitutional or otherwise, that has not been raised and decided in the trial court. . . . This rule applies equally to [alternative] grounds for affirmance." (Internal quotation marks omitted.) *Perez-Dickson* v. *Bridgeport*, 304 Conn. 483, 498–99, 43 A.2d 69 (2012).

This approach, however, appears to be in at least some tension with the "well established [proposition] that this court may rely on any grounds supported by the record in affirming the judgment of a trial court." *State* v. *Burney*, 288 Conn. 548, 560, 954 A.2d 793 (2008). This principle has often been applied to evidentiary errors, including cases where the alternative ground was not first raised before the trial court. See, e.g., id., 560–61 (upholding trial court's decision to admit testimony about victim's demeanor because, although it was improperly admitted as prior consistent statement, it was properly admissible under "alternative approach" that it was not hearsay); *State* v. *Gojcaj*, 151 Conn. App. 183, 199 and n.9, 92 A.3d 1056 (2014) (concluding that trial court properly admitted log record into evidence because it was not hearsay, despite fact that parties agreed it was hearsay and issue before court was applicability of business records exception), cert. denied, 314 Conn. 924, 100 A.3d 854 (2014). The keys here appear to be whether there was any prejudice to the appellant, and also whether the alternative ground "is one [on which] the trial court would have been forced to rule in favor of the appellee." (Internal quotation marks omitted.) *State* v. *Cameron M.*, 307 Conn. 504, 526–27, 55 A.3d 272 (2012) (overruled in part on other grounds by *State* v. *Elson*, 311 Conn. 726, 748 n.14, 91 A.3d 862 [2014]), cert. denied, 569 U.S. 1005, 133 S. Ct. 2744, 186 L. Ed. 2d 194 (2013); see also *Vine* v. *Zoning Board of Appeals*, 281 Conn. 553, 568–69, 916 A.2d 5 (2007).

In its brief, the state does not attempt to tackle this apparent conflict in the case law, citing an Appellate Court decision, *State* v. *Pierce*, 67 Conn. App. 634, 642 n.5. 789 A.2d 496, cert, denied. 260 Conn. 904, 795 A.2d 546 (2002), as its most recent support for the proposition that "a reviewing court may affirm the trial court's judgment on a dispositive [alternative] ground where there is support in the record." In the absence of a request by the state, I similarly decline to resolve this apparent conflict, particularly given my conclusion with respect to harmlessness, and the fact that, as the majority acknowledges, the state did not squarely raise its cumulativeness claim before the Appellate Court and that, in this "certified appeal, the focus of

our review is not the actions of the trial court, but the actions of the Appellate Court. We do not hear the appeal de novo. The only questions that we need consider are those squarely raised by the petition for certification, and we will ordinarily consider these issues in the form in which they have been framed in the Appellate Court." (Internal quotation marks omitted.) *State* v. *Saucier*, 283 Conn. 207, 221, 926 A.2d 633 (2007). This means that, in the absence of "extraordinary circumstances"; *State* v. *Torrence*, 196 Conn. 430, 434 n.5, 493 A.2d 865 (1985); we "ordinarily do not review claims not raised" before the Appellate Court. *State* v. *Nunes*, 260 Conn. 649, 658, 800 A.2d 1160 (2002). Put differently, "a claim that has been abandoned during the initial appeal to the Appellate Court cannot subsequently be resurrected by the taking of a certified appeal to this court." (Internal quotation marks omitted.) *State* v. *Saucier*, supra, 223; see id., 222–23 (declining to consider in certified appeal defendant's claim that excluded statement was not hearsay because, although he raised that argument before trial court, he "subsequently failed to mention that claim in his brief to the Appellate Court, which focused solely on his argument that the statement was hearsay offered to prove the truth of the matter asserted . . . but was admissible pursuant to the state of mind exception"); see also *State* v. *Samuels*, 273 Conn. 541, 555–56, 871 A.2d 1005 (2005) (declining to consider in certified appeal alternative grounds for admission of evidence when state did not raise and brief them before Appellate Court).

I do, however, note this conflict in the case law for future consideration because of the prudential concerns that it continues to raise with respect to the public's interest in maintaining legally correct judgments and avoiding the prospect of costly retrials, with concerns of ambuscade minimized because we would be upholding the trial court's judgment, rather than upsetting it. See *Perez-Dickson* v. *Bridgeport*, supra, 304 Conn. 538–39 (*Palmer, J.*, concurring). I suggest that these prudential concerns are particularly magnified with respect to evidentiary rulings—many of which are made quickly in the heat of trial, with minimal opportunity for research or reflection. See id., 541–42 ("I believe that the public and institutional interest in promoting judicial economy and the finality of judgments substantially outweighs any possible benefit that may be achieved by declining to review an alternative ground for affirmance solely as punishment for the appellee's failure to have raised the claim in the trial court"). Given my conclusion with respect to harmlessness, however, I leave this issue to another day.

[3] Beyond the factual record, I also respectfully disagree with certain legal aspects of the majority's harmless error analysis, which I believe improperly conflate the distinct standards that govern admissibility and harm with respect to whether P's testimony was cumulative for purposes of harm. See *State* v. *Guilbert*, 306 Conn. 218, 267 n.49, 49 A.3d 705 (2012) (contending that concurring justice's arguments "[confuse] the standard for harmless error analysis with the standard for evidentiary admissibility," and noting that because "evidence can have a tendency to make a material fact more or less probable without being such that its exclusion probably affected the verdict, a trial court's decision to exclude some evidence could be erroneous yet harmless"). For example, in concluding that the exclusion of P's testimony was harmful because it was not cumulative, the majority evokes the relevant evidentiary standard in observing that it would have presented new material, which in part conflicted with the testimony of G. See *State* v. *Parris*, 219 Conn. 283, 293, 592 A.2d 943 (1991) ("A trial court's broad discretion to exclude evidence more prejudicially cumulative than probative certainly encompasses the power to limit the number of witnesses who may be called for a particular purpose. . . . In excluding evidence on the ground that it would be only cumulative, care must be taken *not* to exclude merely because of an *overlap* with evidence previously received. To the extent that evidence presents new matter, it is obviously not cumulative with evidence previously received." [Citation omitted; emphasis in original; internal quotation marks omitted.]). I agree with the majority as an *evidentiary* matter, and would view P's proposed testimony as not cumulative for purposes of admissibility because he was the *defendant's* sole witness on this point, and he would have testified that B did not appear to have certain specific symptoms of trauma caused by sexual abuse that the other witnesses did not address. The ultimate question in the present appeal, however, is whether the improper exclusion of that otherwise admissible material substantially affected the jury's verdict, thus requiring a new trial as a remedy. In answering that question, I am constrained to consider the excluded evidence in juxtaposition with the nature and quality of the evidence that already had been admitted.

[4] As the state notes, the defendant did not ask P if he had noticed whether B had become increasingly withdrawn.

[5] These arguments derived from the defendant's cross-examination of B about inconsistencies in her allegations and memories. Turning to the subject of when the family moved to Norwalk and the defendant started having sexual intercourse with B, B testified that she could not remember how old she was when the molestation progressed from inappropriate touching to actual intercourse, or exactly what time of year that had happened. The defendant also established inconsistencies in B's testimony, namely: (1) that she had testified that the first incident of intercourse was in the home's bathroom, but had told the police that the first incident took place in the defendant's bed, and (2) that she had told the police that intercourse occurred on a weekly basis when she had testified that it was less than weekly.

[6] In *State* v. *Whelan*, 200 Conn. 743, 753, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986), this court "adopted a hearsay exception allowing the substantive use of prior written inconsistent statements, signed by the declarant, who has personal knowledge of the facts stated, when the declarant testifies at trial and is subject to cross-examination. This rule has also been codified in § 8-5 (1) of the Connecticut Code of Evidence, which incorporates all of the developments and clarifications of the *Whelan* rule that have occurred since *Whelan* was decided. . . . In addition to signed documents, the *Whelan* rule also is applicable to tape-recorded statements that otherwise satisfy its conditions." (Citation omitted; footnote omitted; internal quotation marks omitted.) *State* v. *Simpson*, 286 Conn. 634, 641–42, 945 A.2d 449 (2008). I note that D had testified at trial somewhat inconsistently with respect to the sequence of events and his memory, thus supporting the admission of his statement to the police under *Whelan.*

[7] I disagree with the majority's assessment of D's testimony as not corroborative of that of B on the grounds that (1) D "did not witness any inappropriate interactions at any time," and (2) D's "testimony was confused, contradictory and difficult to follow." With respect to the fact that D did not actually witness the defendant molesting B, his testimony about their secretive behavior—including the fact that she was putting her belt on *after* B and the defendant had been secreted in a locked bedroom—nevertheless is circumstantial evidence corroborative of, at the very least, inappropriate conduct. Although the defendant posited during closing arguments that the large size of the house and the lack of any apparent embarrassment or distress by the victim supported an innocent explanation for what had happened, I instead suggest that the majority's similar attempt to rationalize an innocent explanation for this sneaky behavior of the defendant vis-á-vis his teenage stepdaughter reminds me of the old West Virginia aphorism that: "You can bake your shoes in the oven, but that won't make them bread." See also, e.g., *State* v. *Otto*, 305 Conn. 51, 70 n.17, 43 A.3d 629 (2012) ("[J]urors are not expected to lay aside matters of common knowledge or their own observations and experiences, but rather, to apply them to the facts as presented to arrive at an intelligent and correct conclusion. . . . Indeed, [i]t is an abiding principle of jurisprudence that common sense does not take flight when one enters a courtroom." [Citation omitted; internal quotation marks omitted.]).

Although I acknowledge that D was required to have his memory refreshed and that his trial testimony was sufficiently inconsistent to support admission of his statement to the police under *State* v. *Whelan*, 200 Conn. 743, 753, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986); see footnote 6 of this dissenting opinion; this court nevertheless is obligated, for purposes of appellate review, to treat this evidence as credited by the finder of fact, which could have viewed the apparent inconsistency as a product of his understandable difficulty in testifying at a trial wherein his father stood charged with sexually assaulting his sister, given his good relationship with both. Cf. *State* v. *Senquiz*, 68 Conn. App. 571, 577, 793 A.2d 1095 ("[w]hile the victim may have sometimes put forth confused, apparently forgetful, or even contradictory testimony, it was solely up to the jury to determine the weight of each part of the victim's testimony"), cert. denied, 260 Conn. 923, 797 A.2d 519 (2002).

[8] Because the error in this case was one of exclusion, rather than inclusion, I acknowledge that any error was not amenable to cure by instruction. See *State* v. *Favoccia*, supra, 306 Conn. 815–16.