******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

## STATE OF CONNECTICUT *v.*
## JAYSON CALDERON-PEREZ
## (AC 46643)

Alvord, Suarez and Seeley, Js.

*Syllabus*

Convicted, following a jury trial, of the crimes of assault in the second degree and breach of the peace in the second degree, the defendant appealed. He claimed, inter alia, that the trial court improperly excluded as irrelevant a uniform arrest report that included evidence of his physical appearance six months after the crime. *Held*:

The trial court abused its discretion in excluding the uniform arrest report as irrelevant, as the central question before the jury was the identity of the perpetrator of the assault, it was vital to the defendant's theory of defense of mistaken identification that he be able to dispute the notion that he was the person depicted in a video of the perpetrator admitted into evidence, which necessarily involved a comparison of the appearance of the perpetrator in the video to that of the defendant, and the fact that the uniform arrest report was prepared six months after the assault was a matter concerning the weight of the evidence to be afforded by the jury, not its admissibility, and it did not diminish its relevance to the issue of the identity of the perpetrator.

The trial court's erroneous exclusion of the uniform arrest report rose to the level of a constitutional violation of the defendant's right to present a defense, as the information pertaining to the defendant's appearance in the uniform arrest report was highly probative, material and potentially exculpatory, the record suggested that the excluded evidence was the most compelling evidence available to the defendant to establish his misidentification defense because it was the only evidence from an independent, objective party that the defendant could have offered at trial concerning his appearance closer to the time of the incident, the defendant took the steps necessary to exercise his right to present a defense, and nothing in the record indicated that there were other means by which the defendant was permitted to adequately present his misidentification defense.

The state failed to meet its burden of demonstrating, beyond a reasonable doubt, that the trial court's erroneous evidentiary ruling was harmless and, thus, the defendant was entitled to a new trial, as there was no independent overwhelming evidence of the defendant's guilt, the uniform arrest report was substantially the only evidence regarding the lack of tattoos on the defendant that he sought to present in support of his defense of mistaken identity, and the harm resulting from the court's exclusion of the evidence was compounded by the prosecutor's remarks during closing argument

about the defendant's appearance, some of which were based on facts that were not in evidence.

Argued November 20, 2024—officially released August 5, 2025

*Procedural History*

Substitute information charging the defendant with the crimes of assault in the second degree and breach of the peace in the second degree, brought to the Superior Court in the judicial district of New Britain, geographical area number seventeen, and transferred to the Superior Court in the judicial district of New Britain, geographical area number fifteen; thereafter, the case was tried to the jury before *Baldini, J.*; verdict and judgment of guilty, from which the defendant appealed to this court. *Reversed*; *new trial.*

*Hope J. Estrella*, deputy assistant public defender, for the appellant (defendant).

*Olivia M. Hally*, deputy assistant state's attorney, with whom, on the brief, were *Sharmese Hodge*, state's attorney, and *Devant Joiner*, senior assistant state's attorney, for the appellee (state).

*Opinion*

SEELEY, J. The defendant, Jayson Calderon-Perez, appeals from the judgment of conviction, rendered after a jury trial, of assault in the second degree in violation of General Statutes § 53a-60 (a) (6) and breach of the peace in the second degree in violation of General Statutes § 53a-181 (a) (1). On appeal, the defendant claims that the trial court deprived him of his right to present a defense under the sixth and fourteenth amendments to the federal constitution by (1) excluding, as irrelevant, evidence of his physical appearance six months after the crime, (2) prohibiting a defense witness from testifying due to late disclosure, (3) preventing the defense from presenting testimony from an expert in

video graphics, and (4) limiting the defendant's cross-examination of a state's witness. In addition, the defendant claims that the prosecutor engaged in impropriety during the state's rebuttal closing argument, thereby depriving the defendant of his due process right to a fair trial under the fifth and fourteenth amendments to the federal constitution. We conclude that the trial court's exclusion of evidence of the defendant's appearance six months after the crime violated the defendant's constitutional right to present a defense.[1] Accordingly, we reverse the judgment and remand the case for a new trial.

The jury reasonably could have found the following facts on the basis of the evidence presented. Early in the morning on August 11, 2018, the victim, Bryan Spickle, was present at a Denny's restaurant in Southington (restaurant). The victim was seated at a table with a group of three other people: Ryan McHale, Miriah Tatro and Julie Henderson. A man (perpetrator) was seated at a nearby table with a group of seven other people. At some point, a verbal altercation ensued between Henderson and members of the perpetrator's group. Eventually, this escalated into a physical altercation when a woman from the perpetrator's group approached Henderson and struck her. Henderson stood up and began fighting with the woman that attacked her; meanwhile, the victim also stood up and was accosted by three members of the perpetrator's group, including the perpetrator, but did not physically engage with them. The victim then made his way toward the women who were fighting and began to reach toward Henderson, at which point the perpetrator "sucker punched" the victim in the side of the head "from behind." The punch knocked the victim unconscious, and he fell face-first onto a table occupied by two other restaurant patrons, Michelle Yaglowski and

---

[1] See footnote 18 of this opinion.

Dahnis-Shay Houser-Riley. The perpetrator then punched the unconscious victim in the head a second time. As a result of the assault, the victim suffered a concussion, lacerations to both eyebrows, significant swelling to his right eye and cheek, and bubbling and blistering on his chest due to a skin burn.[2] A few minutes later, the perpetrator and his group left the restaurant.

Around the time the perpetrator and his group exited the restaurant, police officers from the Southington Police Department were dispatched to the restaurant in response to a report of a fight.[3] Upon arriving at the scene, the responding officers approached two women standing in the restaurant's parking lot: Robin Angeloni, a waitress who was attempting to point out to the officers certain vehicles that had just left the parking lot, and Tatro, who was "hysterical" and "yelling" racial slurs. The officers spoke with Angeloni before entering the restaurant, and, around the same time, the victim was transported by paramedics to a hospital. Inside the restaurant, the officers took a statement from Houser-Riley and learned that the assault likely was captured by security cameras, which also would have captured footage of the perpetrator and his group exiting the restaurant. The investigating officer, Chad Michaud of the Southington Police Department, obtained this security camera footage (video) shortly thereafter.

On the basis of his review of the video, Michaud identified the woman who had attacked Henderson and the man who had punched the victim as suspects in the investigation. On September 10, 2018, as part of Michaud's investigation, the Southington Police Department made a post on its public Facebook page soliciting

[2] The jury reasonably could have found that the skin burn to the victim's chest was caused by hot coffee that spilled on him during the assault.

[3] Yaglowski had called 911 as the verbal altercation between Henderson and the woman at the perpetrator's table escalated. Megan McElhone, a restaurant employee, also had called 911 after the physical altercation began.

tips regarding the assault. The post contained still images from the video of both suspects leaving the restaurant. One month later, on October 10, 2018, Michaud received a voicemail from an anonymous caller stating that an employee at Henry's Garage, in Bethany, "looks like the male suspect . . . ." Because Bethany was outside the jurisdiction of the Southington Police Department, Michaud contacted the Connecticut State Police for assistance in following up on the tip.

On October 12, 2018, after being briefed by Michaud, David Merriam of the Connecticut State Police went to Henry's Garage to follow up on the tip. At Henry's Garage, Merriam spoke with Henry Sarbieski,[4] the owner of the business, showed him three photographs of the male suspect that had been taken from the video, which Michaud had provided to him, and asked Sarbieski if he knew the person in the photographs. Sarbieski identified the person in the photographs as the defendant and informed Merriam that the defendant was present at work. Merriam then spoke with the defendant, showed him the photographs that Michaud had provided to him, and asked the defendant if he was the person in the photographs. Although the defendant replied affirmatively, he expressed confusion about being at the restaurant's Southington location, telling Merriam that he had been to the restaurant's Waterbury location. Merriam told the defendant to contact Michaud and collected his contact information, which he then emailed to Michaud.

After learning from Merriam that the defendant had identified himself as the person in the photographs, Michaud determined that "the investigation was basically concluded" and, subsequently, applied for a warrant to arrest the defendant, which was reviewed and

---

[4] Throughout the trial court record, Sarbieski's name is occasionally spelled as Sabieski.

issued by the court on January 9, 2019. The defendant was arrested on February 11, 2019. Following his arrest, the defendant was charged in a substitute long form information with assault in the second degree in violation of § 53a-60 (a) (6) and breach of the peace in the second degree in violation of § 53a-181 (a) (1). A jury trial followed, at which the state presented testimony from Michaud; McHale; Yaglowski; Sarbieski; Merriam; Jessica Nocera, a legal technology specialist at the Office of the Chief State's Attorney; and the victim. The defendant presented testimony from Suzanne Bobrowiecki, an investigator at the New Britain public defender's office, and from three waitresses at the restaurant who had witnessed the assault: Angeloni, Megan McElhone and Lindsay Matthews. At trial, Angeloni testified that she saw the perpetrator and that the individual was not the defendant, but she could not otherwise describe the perpetrator. McElhone testified that she saw the perpetrator and that he was not the defendant. She described the perpetrator as "maybe Dominican, Jamaican, but he was darker skinned, probably about my height, five six, five five, not heavy, in pretty good shape but a smaller gentleman. He was not very tall but he was definitely dark skinned . . . ." Matthews also testified that she saw the perpetrator and that he was not the defendant, and she described the perpetrator as "[p]robably about six two, I mean very, very tall gentleman, darker complexion." In summary, the three waitresses at the restaurant who had witnessed the assault all affirmatively testified that the defendant was not the perpetrator, and no other eyewitness identified the defendant as the perpetrator.

At the conclusion of trial, the case was submitted to the jury, which found the defendant guilty of both charges. On May 11, 2023, the court, *Baldini, J.*, sentenced the defendant to a total effective term of five years and ten months of incarceration and four years

and two months of special parole. This appeal followed. Additional facts and procedural history will be set forth as necessary.

The defendant claims that the court abused its discretion when it ruled that "evidence of the defendant's height and weight . . . and whether he had tattoos on his forearms was irrelevant . . . ." In support of his claim that the court improperly excluded that evidence, the defendant argues that such evidence was "relevant and material" because it "would have corroborated [his] assertion that he was not the perpetrator . . . ." He further asserts that "the court's conclusion that [such evidence] was irrelevant is wrong and violated his right to present a defense." The essence of the defendant's argument is that, because his defense was a claim of misidentification, evidence of his appearance during his arrest was highly relevant and material to his defense. Finally, he contends that, because the court's erroneous evidentiary ruling rose to the level of a constitutional violation, the state bore the burden of proving that the ruling was harmless beyond a reasonable doubt and that the state failed to do so.[5] We agree with the defendant that the court abused its discretion in precluding the proffered evidence and that the ruling deprived him of his constitutional right to present a defense. Furthermore, we also agree that the state failed to prove that the ruling was harmless beyond a reasonable doubt, and, therefore, the defendant is entitled to a new trial.

We first set forth the legal principles governing our resolution of this claim. "It is fundamental that the defendant's [right] . . . to present a defense [is] guaranteed by the sixth amendment to the United States

---

[5] The defendant also asserts that, to the extent that the court's ruling did not rise to the level of a constitutional violation, it nevertheless constituted harmful error warranting reversal and a new trial.

constitution[6] . . . [which is] made applicable to state prosecutions through the due process clause of the fourteenth amendment.[7] . . . A criminal defendant's right to present a defense is the right to present the defendant's version of the facts as well as the prosecution's to the jury so that it may decide where the truth lies. . . . Therefore, exclusion of evidence offered by the defense may result in the denial of the defendant's right to present a defense." (Citation omitted; footnotes added; internal quotation marks omitted.) *State* v. *Torres*, 343 Conn. 208, 217, 273 A.3d 163 (2022). "[T]he federal constitution require[s] that criminal defendants be afforded a meaningful opportunity to present a complete defense." (Internal quotation marks omitted.) *State* v. *Tony M.*, 332 Conn. 810, 831, 213 A.3d 1128 (2019).

"A [criminal] defendant has a constitutional right to present a defense, but he is [nonetheless] bound by the rules of evidence in presenting a defense. . . . Although exclusionary rules of evidence cannot be applied mechanistically to deprive a defendant of his rights, the constitution does not require that a defendant be permitted to present every piece of evidence he wishes. . . . Accordingly, [i]f the proffered evidence is not relevant [or is otherwise inadmissible], the defendant's right to [present a defense] is not affected, and the evidence was properly excluded. . . . Thus, the

---

[6] The sixth amendment to the United States constitution provides in relevant part: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him; [and] to have compulsory process for obtaining witnesses in his favor . . . ."

"A defendant's right to present a defense is rooted in the compulsory process and confrontation clauses of the sixth amendment . . . ." (Internal quotation marks omitted.) *State* v. *Andrews*, 313 Conn. 266, 272 n.3, 96 A.3d 1199 (2014).

[7] The fourteenth amendment to the United States constitution, § 1, provides in relevant part: "No State shall . . . deprive any person of life, liberty or property, without due process of law . . . ."

question of the admissibility of the proffered evidence is one of evidentiary, but not constitutional, dimension. . . .

"It is axiomatic that [t]he trial court's ruling on the admissibility of evidence is entitled to great deference. . . . In this regard, the trial court is vested with wide discretion in determining the admissibility of evidence, including issues of relevance and the scope of cross-examination. . . . Accordingly, [t]he trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . In determining whether there has been an abuse of discretion, every reasonable presumption should be made in favor of the correctness of the trial court's ruling . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Mark T.*, 339 Conn. 225, 231–32, 260 A.3d 402 (2021). "If, after reviewing the trial court's evidentiary rulings, we conclude that the trial court properly excluded the proffered evidence, then the defendant's constitutional claims necessarily fail." (Internal quotation marks omitted.) *State* v. *Espinal*, 208 Conn. App. 369, 379, 264 A.3d 1003, cert. denied, 340 Conn. 916, 266 A.3d 886 (2021). With these general principles in mind, we turn to the defendant's first claim.

I

The first issue we must decide with respect to this claim is whether the court abused its discretion in excluding the challenged evidence relating to the defendant's appearance as not relevant. The state argues that "the court reasonably concluded that the proffered evidence was not relevant because [information about the defendant's appearance] from six months after the crime is not accurate of [his] appearance at the time of the crime." We do not agree with the state.

The following additional facts guide our analysis of this issue. At trial, the state's theory was that the defendant was the perpetrator of the assault of the victim at

the restaurant depicted in the video, as evidenced by the fact that the defendant and Sarbieski had identified the defendant as the person in the still photographs taken from the video. To counter this, the defendant's theory of defense was that he and Sarbieski mistakenly had identified the defendant as the person in the still photographs.[8] That theory was supported by the fact that Sarbieski later retracted his identification. Specifically, during direct examination of Sarbieski by the prosecutor, Sarbieski testified that, although he initially had identified the defendant as the person in the photographs presented to him by Merriam, upon later inspection, he "saw tattoos" on the person in the photographs and noted that the defendant does not have such tattoos. At the request of the prosecutor, Sarbieski identified the left and right arms of the person in the photographs of the video as being tattooed.

After the close of the state's case-in-chief and during a discussion with the court regarding the defense's witnesses, defense counsel stated that the defense planned on eliciting testimony from Bobrowiecki concerning an investigation of the defendant's case she had performed as an investigator for the New Britain public defender's office. Specifically, defense counsel sought to elicit testimony about "[i]dentifying information regarding [the defendant]," in particular, his "height and weight at a time more contemporaneous to the incident" and "whether . . . [the defendant] has any tattoos on his forearms." Defense counsel asserted that Bobrowiecki had acquired personal knowledge of this information by reviewing a uniform arrest report regarding the defendant's arrest, which Bobrowiecki had obtained

---

[8] In his principal appellate brief, the defendant asserts that, although he did not testify, "the defense maintained throughout trial that [he] was not pictured in the photographs or the [video] and that any identification made by the defendant was incorrect and based on the poor quality of the video and the lack of information from [Merriam]." In support of this assertion, he cites to Sarbieski's testimony and to the closing argument of defense counsel.

during the course of her investigation and which the defendant sought to admit into evidence through her testimony. The uniform arrest report, which was prepared on February 11, 2019, approximately six months after the incident at the restaurant, provided that the defendant was five feet, ten inches tall, weighed 240 pounds, and did not have any tattoos.

The prosecutor objected to the admission of this evidence on the ground of relevance.[9] In arguing against the objection, defense counsel emphasized that the evidence was "essential information to provide [to] the trier of fact in assessing whether or not the individual in the video is [the defendant]" and that it was "essential to the defense's case . . . [to be] able to present testimony as to the tattoo status of [the defendant]." After hearing from the prosecutor and defense counsel regarding the objection, the court ruled: "[T]here's the issue of what [the defendant] looked like six months after the incident that forms the basis of the charges against him. Certainly . . . I think we talked about the fact that someone can change their appearance in that amount of time and . . . I understand the issue you brought up about tattoos. People can also get tattoos removed. So, in terms of offering testimony about [the defendant's] appearance six months after this incident through this witness, that request is denied."

Following the court's exclusion of this evidence, the jury heard testimony from several witnesses concerning

---

[9] Specifically, the prosecutor argued in relevant part: "[Y]ou can put on 1000 pounds in six months. Maybe not 1000, but you can put on a significant amount of weight and your body can change in six months. . . . What [the defendant's] height and weight looked like . . . in February of 2019, I do not believe is relevant. The jury can watch the video and make a determination that if the gentleman they see on the video is in fact [the defendant]. Having someone come in and say the person . . . that was arrested appears to be fifty pounds heavier than the other is not relevant . . . . There is a passage of time. We can't say what this gentleman did over that six month period and how he may have changed. That's a question for the jury to decide . . . and not for their investigator to testify to."

the height and weight of the perpetrator and whether he had any tattoos; that is, McElhone described the perpetrator as "[m]aybe Dominican, Jamaican . . . darker skinned, probably about . . . five six, five five [in height], not heavy, in pretty good shape but a smaller gentleman" and "not very tall"; and Matthews described the perpetrator as "[p]robably about six two, I mean very, very tall gentleman, darker complexion." Defense counsel asked Matthews if she remembered "whether [the person who threw the punch] had tattoos on their forearms," to which she replied: "Yes, I think so."

The defendant's theory of defense is apparent from the arguments of defense counsel and the prosecutor during closing and rebuttal closing arguments, as the subjects of the height and weight of the perpetrator, and whether the perpetrator had any tattoos on his forearms, were repeatedly referenced by defense counsel and the prosecutor in their summations of the evidence adduced at trial and their theories of the case. For example, defense counsel stated in relevant part: "[Sarbieski] testified that he had been shown pictures on October 12, [2018] . . . . And on that day, he said that he told [Merriam] that the pictures look like [the defendant]. . . . But all he looked at, he told us, was the face of the person in the pictures. The face. He later noticed that the . . . person in the images, the suspect, looked like they had tattoos on their arms and that [the defendant] doesn't have any tattoos on his arms. And when he was asked to look at the video . . . [w]hat he said was see, tattoos [on] both arms."

In rebuttal closing argument, the prosecutor summarized the testimony of the eyewitnesses, noting specifically their testimony about the height of the perpetrator several times. The prosecutor then stated: "What can you reasonably infer from these three witnesses? The person who did this is between six feet, four inches and . . . five feet, five inches. [The defendant] was

definitely there, maybe not there, definitely not there. Do any of these things match what you've seen and heard during testimony and in evidence? If the person who punched [the victim] is six feet, two inches, [or] six feet, four inches, watch the video at the end. There's a guy standing next to the person who assaults [the victim]. We say it's [the defendant]. That guy has to be seven foot if the person standing next to him is six feet, two inches, six feet, four inches. Or does he look as short as five feet, five inches [or] five feet, six inches?"

The prosecutor then turned to the issue of tattoos, stating: "Sarbieski says he—[Merriam] says he showed [Sarbieski] all three photos, and he says it's [the defendant] and he [identifies] him here in court. Now [Sarbieski] testified he doesn't think it's [the defendant] now because the guy in the video has tattoos down both arms. Watch state's exhibit 2, camera six, when the assault takes place. Immediately before and immediately after. I want you each to sit in front of that laptop and watch that scene right before he's punched and immediately after. Pause it, stop it. Pause it, stop it. You are going to get a . . . clear look at both of his arms. The right and left. There will be clear photos. There are no tattoos on his arms, members of the jury, and you can see that in the video. Watch it closely. Take the time to look at it.

"And you heard [Sarbieski say that he has] known [the defendant] for six to eight years. [The defendant] does not have tattoos. He's a good friend, a great mechanic, and, probably assuming, a good employee. So yeah, maybe for [Sarbieski] it's not [the defendant] now. But, who pointed out to [Sarbieski] about those tattoos? Who told him hey, look at the picture, look at the tattoos? [The defendant] showed him those pictures. The one person who benefits the most from [Sarbieski] changing his identification shows him tattoos that don't exist."

The prosecutor continued: "Four and a half years have passed since this incident, members of the jury. People change in time. I want you all to take a close look at [the defendant] now. Look at his face. Commit it to memory. What you're looking at is not [the defendant] from 2018. You're looking at him now. The video is [the defendant] four and a half years ago. As counsel stated, we had a pandemic.[10] The pandemic thirty was a real thing. Right? Some of us are still trying to take that weight off. So, look at his face. Commit it to memory. Members of the jury, it is not the state who will have to look at that video and decide if the person who assaulted [the victim] on August 11, 2018, is [the defendant]. It is going to be your responsibility." (Footnote added.)

We next set forth the legal principles governing this issue. "Section 4-1 of the Connecticut Code of Evidence provides that ' "[r]elevant evidence" means evidence having any tendency to make the existence of any fact that is material to the determination of the proceeding more probable or less probable than it would be without the evidence.' This court has noted that '[r]elevant evidence is evidence that has a logical tendency to aid the trier in the determination of an issue. . . . One fact is relevant to another if in the common course of events the existence of one, alone or with other facts, renders the existence of the other either more certain or more probable. . . . Evidence is not rendered inadmissible because it is not conclusive. All that is required is that the evidence tend to support a relevant fact even to a slight degree, [as] long as it is not prejudicial . . . .' " *State* v. *Kenneth B.*, 223 Conn. App. 270, 281–82, 308 A.3d 82, cert. denied, 348 Conn. 952, 308 A.3d 1038 (2024); see also Conn. Code Evid. § 4-2 (providing that

---

[10] The prosecutor was alluding to the fact that, during the defense's closing argument, defense counsel mentioned that the assault took place four years ago and that "COVID has happened since then."

"[a]ll relevant evidence is admissible" unless there is legal basis for its exclusion); *State* v. *Isabelle*, 107 Conn. App. 597, 607, 946 A.2d 266 (2008) ("[i]t is a reasonable exercise of judicial discretion to exclude . . . evidence the relevancy of which appears to be so slight and inconsequential that to admit it would distract attention which should be concentrated on vital issues of the case" (internal quotation marks omitted)).

" ' "Relevance" does not exist in a vacuum. Under traditional definitions, to be relevant, a fact must be "*material*," a term which [Federal Rule of Evidence] 401 replaces with the phrase, "fact that is *of consequence* to the determination of the action." ' . . . 2 C. Fishman, Jones on Evidence (7th Ed. 1994) § 11:3, p. 260. 'Relevant evidence,' according to § 4-1 of the Connecticut Code of Evidence, is 'evidence having any tendency to make the existence of any fact that is *material* to the determination of the proceeding more probable or less probable than it would be without the evidence.' . . . 'To determine whether a fact is "material" or "consequential," it is necessary to examine the issues in the case, as defined by the underlying substantive law, the pleadings, applicable pretrial orders, and events that develop during the trial. Thus, the relevance of an offer of evidence must be assessed against the elements of the cause of action, crime, or *defenses* at issue in the trial. The connection to an element need not be direct, so long as it exists. Once a witness has testified to certain facts, for example, his credibility is "a fact that is of consequence to [or material to] the determination of the action," *and evidence relating to his credibility is therefore relevant—but only if the facts to which the witness has already testified are themselves relevant to an element of a crime, cause of action, or defense in the case.*' . . . 2 C. Fishman, supra, pp. 260–61." (Emphasis altered.) *State* v. *Fasano*, 88 Conn. App. 17, 36–37, 868 A.2d 79, cert. denied, 274

Conn. 904, 876 A.2d 15 (2005), cert. denied, 546 U.S. 1101, 126 S. Ct. 1037, 163 L. Ed. 2d 873 (2006).

Additionally, "[i]t is black letter law that in any criminal prosecution, the state bears the burden of proving beyond a reasonable doubt the defendant's identity as . . . the [perpetrator] of the crime charged. . . . *State* v. *Jackson*, 179 Conn. App. 40, 47, 177 A.3d 1190 (2017), cert. denied, 328 Conn. 910, 178 A.3d 1041 (2018). [T]he question of identity of a perpetrator of a crime is a question of fact that is within the sole province of the jury to resolve. . . . *State* v. *Honsch*, 349 Conn. 783, 811, 322 A.3d 1019 (2024)." (Internal quotation marks omitted.) *State* v. *Makins*, 232 Conn. App. 199, 208–209, 335 A.3d 67 (2025), petition for cert. filed, (Conn. June 10, 2025) (No. 240398); see also *State* v. *Honsch*, supra, 811 ("[t]he question of identity of a perpetrator of a crime . . . [is an] essential element" (internal quotation marks omitted)); *State* v. *Jackson*, 37 Conn. App. 491, 499, 656 A.2d 1056 (1995) ("[i]dentity is always an issue in any criminal case, and the burden [is always] on the prosecution to prove the element of identification beyond a reasonable doubt" (internal quotation marks omitted)).

Evidence that is probative of identity is especially relevant when identity is in dispute, as it was in the present case. See *State* v. *Reese*, 77 Conn. App. 152, 166, 822 A.2d 348 (noting that "[t]he photograph [of the defendant taken approximately six weeks before the crime] was relevant to show [his] appearance" where "identification . . . was an issue"), cert. denied, 265 Conn. 910, 831 A.2d 252 (2003). Thus, in such cases, evidence of a defendant's appearance is generally considered to have strong probative value with respect to the issue of identity.[11]

---

[11] See, e.g., *Shiflett* v. *State*, 52 Ala. App. 476, 480, 294 So. 2d 444 (1973) (photograph of defendant showing his appearance one month after crime had probative value on issue of identity), cert. denied, 292 Ala. 749, 294 So. 2d 448, cert. denied, 419 U.S. 867, 95 S. Ct. 124, 42 L. Ed. 2d 105 (1974);

Significantly, courts routinely have considered evidence regarding whether a defendant is tattooed to be relevant to the issue of identity.[12] See, e.g., *State* v. *Buck*, 100 N.E.3d 118, 140 (Ohio App. 2017) ("Courts have found evidence that a defendant has a particular tattoo to be relevant for various purposes. For example, tattoo evidence may be relevant to the identification of the defendant."), review denied, 152 Ohio St. 3d 1444, 96 N.E.3d 299 (2018).[13] Furthermore, evidence regarding

*State* v. *Jamison*, 163 S.W.3d 552, 560 (Mo. App. 2005) ("[e]vidence demonstrating the identity of the person charged with the commission of the crime is logically relevant"); *People* v. *Chiari*, 220 App. Div. 2d 316, 316, 632 N.Y.S.2d 564 ("[w]here defendant argued that this was a case of mistaken identity and that he was not the man who had sold cocaine to the undercover [police officer], his arrest photo was properly admitted to establish his appearance at the time of the crime"), appeal denied, 87 N.Y.2d 899, 663 N.E.2d 1259 (1995).

[12] Similarly, evidence regarding a defendant's appearance is also relevant to identification. For example, this court previously has concluded that a defendant's "physical description," which necessarily includes height and weight, "may be used for identification purposes . . . ." *State* v. *Davis*, 160 Conn. App. 251, 268, 124 A.3d 966, cert. denied, 320 Conn. 901, 127 A.3d 185 (2015). In *Davis*, the issue before this court concerned whether the evidence was sufficient to demonstrate that the defendant, who had been convicted of operating a motor vehicle while under the influence of intoxicating liquor in connection with an incident in November, 2010, and of being a third time offender, was the same person who previously had been convicted of operating a motor vehicle while under the influence to support his conviction as a third time offender. Id., 266–67. In concluding that the record contained ample evidence to support the defendant's conviction, this court pointed out that the record contained a certified copy of a judgment of conviction in 2007, which listed a name, date of birth, and home address matching the defendant's information. Id., 267–68. That document also included an attached motor vehicle summons and complaint that listed a physical description matching that of the defendant. Id., 269. This court also noted that the physical description of the defendant's height, weight, and color of his hair and eyes in the 2007 summons and complaint matched the physical description of the defendant in his uniform arrest report. Id., 269 n.8.

[13] See also *People* v. *Skinner*, 53 P.3d 720, 723 (Colo. App. 2002) ("evidence of tattoos can be relevant to the issue of identity"); *Belmar* v. *State*, 279 Ga. 795, 798, 621 S.E.2d 441 (2005) ("We have upheld the admission of a photograph of a tattoo on the body of the defendant . . . when it is used for purposes of identification. . . . Other courts also have admitted evidence of tattoos . . . to aid in identification." (Citations omitted.)).

a defendant's tattoos, such as from a photograph or testimonial description, is generally considered relevant to the issue of identity, regardless of when it was created or perceived. See *State* v. *Carpenter*, 232 N.C. App. 637, 642, 754 S.E.2d 478, review denied, 367 N.C. 518, 762 S.E.2d 443 (2014); *Stone* v. *State*, 635 S.W.3d 763, 770 (Tex. App. 2021); see also *State* v. *Rios*, 171 Conn. App. 1, 41, 156 A.3d 18 ("[n]umerous courts have upheld the admission of tattoo evidence after weighing the probative value of the evidence versus its prejudicial effects"), cert. denied, 325 Conn 914, 159 A.3d 232 (2017). To be sure, such evidence is generally considered to be relevant to the issue of identity even if it comes in the form of an in-person display before the jury during trial. See, e.g., *State* v. *Hubbard*, 659 S.W.2d 551, 559 (Mo. App. 1983) (rejecting defendant's argument that "trial court erred in requiring him to expose his tattooed arms during the trial because such display had no probative value, was immaterial and prejudicial" and concluding, instead, that "[e]vidence of [his] tattoos was relevant as corroboration of [a witness'] identification of [his] other physical features"); *State* v. *Meade*, 196 W. Va. 551, 557, 474 S.E.2d 481 (1996) ("ordinarily, it is not an abuse of discretion for a trial court in a criminal case to direct the accused to reveal or display the accused's tattoos to a witness and to the jury at trial, where the accused's tattoos are relevant to the question of the identification of the perpetrator of the offense and where the trial court has weighed the probative value of such evidence against the danger of unfair prejudice").[14]

---

[14] The state argues that we should not be persuaded by cases in which, unlike the present case, the jury was not presented with a video of the perpetrator. We find this argument unavailing given that a determination of whether the person in the video had tattoos is not easily discernable and that identity was disputed. As a result, the excluded evidence could have assisted the jury, at least to some degree, in determining whether the defendant was correctly identified as the person in the still photographs taken from the video.

In the present case, the central question before the jury was the identity of the perpetrator; that is, whether the defendant was the person depicted in the video. As we have stated, the three waitresses at the restaurant who had witnessed the assault all testified affirmatively that the defendant was not the perpetrator. This meant that the only identifications of the defendant as the perpetrator consisted of (1) the defendant's self-identification, which was made on the basis of the still photographs, not the video of the incident, and (2) Sarbieski's initial identification of the defendant as the person in the still photographs, which he retracted at trial, testifying that he was mistaken because the perpetrator, unlike the defendant, had tattoos on his arms. It was vital to the defendant's theory of defense of mistaken identification, therefore, that he be able to dispute the notion that he was the person depicted in the video of the perpetrator, which, necessarily, involves a comparison of the appearance of the perpetrator in the video to that of the defendant.

There was testimony before the jury about the height and build, or weight, of the perpetrator, as well as whether the perpetrator had tattoos on his arms. Moreover, the height, weight, and tattoos of the perpetrator undeniably were connected to the defendant's theory of defense that he was not the person depicted in the video, which rendered them material to the issue of identity in this case. See *State* v. *Mark T.*, supra, 339 Conn. 242 ("[t]he degree to which any evidence is material and relevant must be assessed in light of the fact or issue that it was intended to prove" (internal quotation marks omitted)). As we have stated, evidence is relevant when it tends to support a relevant fact, even to a slight degree; see *State* v. *Kenneth B.*, supra, 223 Conn. App. 282; it "is not rendered inadmissible just because it is circumstantial or not conclusive"; *State* v. *Hamilton*,

352 Conn. 317, 354, A.3d (2025); and its relevance must be assessed against, inter alia, the elements of the defense at issue in the trial. See *State* v. *Fasano*, supra, 88 Conn. App. 36–37. The defendant's defense was that he was not the person who committed the assault because, primarily, the perpetrator had tattoos on his forearms and the defendant does not have tattoos on his forearms. To support that defense, he wanted to present evidence demonstrating that he did not have any such tattoos six months after the incident at the restaurant.

Moreover, not only did the prosecutor in this case utilize the testimony about the height, weight, and tattoos of the perpetrator in his closing argument to assert the state's position that the defendant's appearance matched that of the perpetrator, but he also specifically pointed out that the trial was taking place four and one-half years after the incident at the restaurant and that the jury should, thus, account for weight gain due to the COVID-19 pandemic, which occurred in the interim. Consequently, evidence of the defendant's height and weight, and whether he had tattoos on his forearms when he was arrested six months after the incident, which was much closer in time to the assault than when the trial occurred, was relevant to the issue of identity and the defendant's theory of defense. The court's ruling precluding the evidence was based on its conclusion that the proffered evidence was not relevant because, within six months, a person's appearance can change and tattoos can be removed. The fact that the information was recorded six months following the assault, however, was a matter concerning the weight of the evidence to be afforded by the jury, not its admissibility, and that does not diminish its relevance to the issue of the identity of the perpetrator, which was the central issue at trial.

The court's concern that, during the course of six months, a person's appearance can change and tattoos can be removed, also involves a reasonable, common-sense inference that the jury could have drawn when considering the evidence. See *State* v. *Patrick M.*, 344 Conn. 565, 576, 280 A.3d 461 (2022) ("[t]he jury is permitted to rely on its common sense, experience and knowledge of human nature in drawing inferences . . . and may draw factual inferences on the basis of already inferred facts" (internal quotation marks omitted)); *State* v. *Torres*, 82 Conn. App. 823, 831, 847 A.2d 1022 ("Jurors do not live in a fishbowl. . . . In considering the evidence . . . [j]uries are not required to leave common sense at the courtroom door . . . ." (Internal quotation marks omitted.)), cert. denied, 270 Conn. 909, 853 A.2d 525 (2004); see also, e.g., *People* v. *Harland*, 251 P.3d 515, 519 (Colo. App. 2010) (rejecting "argument that [the victim's] description of the [defendant's] teddy bear tattoo was not probative of identity" and recognizing that "[a]ny discrepancy between [the victim's] description of the tattoo . . . and the [other] evidence [about the tattoo] . . . was for the jury to weigh"), cert. denied, Docket No. 10SC563, 2011 WL 51758 (Colo. January 3, 2011). Because the issue of whether the perpetrator had tattoos on his arms was raised before the jury through the testimony of Sarbieski and Matthews, it follows that whether *the defendant* had tattoos on his arms was highly relevant to the issue of identity. See, e.g., *Stone* v. *State*, supra, 635 S.W.3d 770 ("[e]vidence of [the defendant's] back tattoos," namely, "a photograph of [his] back tattoos" taken at undisclosed time, "was relevant to his identity because no witness at the crime scene could identify [him], and the witness . . . described a tattooed man"); see also *State* v. *Carpenter*, supra, 232 N.C. App. 642 (photographs of defendant's tattoo taken six months after his arrest "were relevant to proving his identity as the perpetrator").

Evidence tending to show that the perpetrator's appearance was inconsistent with the defendant's appearance, including whether the former had tattoos whereas the latter did not, was, therefore, "relevant and material to" a "defense theory [that] related to a central and critical question before the jury," namely, whether the defendant was correctly identified as the perpetrator. *State* v. *Wright*, 320 Conn. 781, 821, 135 A.3d 1 (2016).

It is also significant that the three waitresses who witnessed the assault all testified that the defendant was not the person who assaulted the victim. See *Thomas* v. *State*, 811 P.2d 1337, 1343 (Okla. Crim. App. 1991) ("in light of the witness' inability to identify [the defendant] . . . the testimony concerning the [defendant's] tattoo must be considered relevant evidence"), cert. denied, 502 U.S. 1041, 112 S. Ct. 895, 116 L. Ed. 2d 798 (1992). Therefore, at a minimum, the admission of the uniform arrest report, which stated that the defendant did not have tattoos on his arms at the time of his arrest, would have had at least a slight logical tendency to aid the jury in its determination of whether the defendant was correctly identified as the person in the video. See *State* v. *Kenneth B.*, supra, 223 Conn. App. 282. The uniform arrest report also may have influenced the jury's determination of guilt given that the state lacked any physical or direct evidence implicating the defendant in the assault of the victim. Again, the issue of whether the defendant had tattoos removed between the time of the incident at the restaurant and his arrest six months later was a matter for the jury to consider in determining what weight, if any, to give such evidence.

We, therefore, conclude that the court abused its discretion in determining that the proffered evidence of the defendant's appearance, as described in the uniform arrest report, was not relevant and excluding it on that basis.

## II

Having determined that the court abused its discretion in excluding the evidence as irrelevant, we next must determine whether the improper evidentiary ruling rose to the level of a constitutional violation of the defendant's right to present a defense. See *State* v. *Vitale*, 197 Conn. 396, 403, 497 A.2d 956 (1985).

The following legal standards guide our resolution of this issue. "[W]hether a trial court's [exclusion of evidence offered by a criminal defendant] deprives [him] of his [constitutional] right to present a defense is a question that must be resolved on a case by case basis. . . . The primary consideration in determining whether a trial court's ruling violated a defendant's right to present a defense is the centrality of the excluded evidence to the claim or claims raised by the defendant at trial. . . . Moreover, [a] defendant may not successfully prevail on a claim of a violation of his right to present a defense if he has failed to take steps to exercise the right or if he adequately has been permitted to present the defense by different means." (Citation omitted; internal quotation marks omitted.) *State* v. *Leniart*, 198 Conn. App. 591, 603–604, 233 A.3d 1183, cert. denied, 335 Conn. 971, 240 A.3d 1055 (2020).

Although "[i]t is well established that [t]he federal constitution require[s] that criminal defendants be afforded a meaningful opportunity to present a complete defense," our appellate courts have not expressly set forth what that guarantee entails. (Internal quotation marks omitted.) *State* v. *Hedge*, 297 Conn. 621, 634, 1 A.3d 1051 (2010). A review of our case law indicates that this right encompasses, at least, the presentation of evidence that is exculpatory, material, or otherwise central to a claim raised by the defendant at trial; see, e.g., *State* v. *Wright*, supra, 320 Conn. 821 (trial court's exclusion of evidence that was relevant and material

to "defense theory [that] related to a central and critical question before the jury" violated defendant's constitutional right to present defense); *State* v. *Cerreta*, 260 Conn. 251, 264, 796 A.2d 1176 (2002) (trial court's erroneous exclusion of evidence amounted to constitutional violation because "[t]he excluded evidence not only was relevant to the primary issue at trial, namely, the identity of the perpetrator, it was central to the defendant's claim of innocence" and "crucial to his defense"); *State* v. *Leniart*, supra, 198 Conn. App. 603 ("[t]he primary consideration in determining whether a trial court's ruling violated a defendant's right to present a defense is the centrality of the excluded evidence to the claim or claims raised by the defendant at trial" (internal quotation marks omitted)); and, perhaps also, evidence that is simply admissible and relevant. See *State* v. *Morgan*, 70 Conn. App. 255, 265, 797 A.2d 616 ("[a] defendant's right to present a defense guarantees his or her right, to be exercised within limits, to present *relevant* evidence" (emphasis in original)), cert. denied, 261 Conn. 919, 806 A.2d 1056 (2002). Accordingly, our Supreme Court has recognized that "[t]he defendant's right to present a defense 'would be an empty one if the [s]tate were permitted to exclude competent, reliable evidence . . . when such evidence is central to the defendant's claim of innocence.' " *State* v. *Cerreta*, supra, 264–65, quoting *Crane* v. *Kentucky*, 476 U.S. 683, 690, 106 S. Ct. 2142, 90 L. Ed. 2d 636 (1986); see also *United States* v. *Scheffer*, 523 U.S. 303, 315, 118 S. Ct. 1261, 140 L. Ed. 2d 413 (1998) (observing that "[t]he exclusions of evidence that [the United States Supreme Court] [has] declared unconstitutional . . . significantly undermined fundamental elements of the defendant's defense"); *Pennsylvania* v. *Ritchie*, 480 U.S. 39, 56, 107 S. Ct. 989, 94 L. Ed. 2d 40 (1987) ("at a minimum . . . criminal defendants have . . . the right to put before a jury evidence that might influence the determination of guilt").

In light of these principles, the essential question in the present case of whether the defendant was afforded a meaningful opportunity to present a complete defense involves a determination of whether the court's exclusion of the uniform arrest report significantly undermined a central aspect of the defendant's defense. See *State* v. *Cerreta*, supra, 260 Conn. 264–65; see also *United States* v. *Scheffer*, supra, 523 U.S. 315. If the evidence was central to the misidentification defense the defendant sought to present and might have influenced the jury's determination of guilt, the court's erroneous exclusion of the evidence amounted to a violation of the defendant's constitutional right to present a defense. See *State* v. *Cerreta*, supra, 264–65; see also *Pennsylvania* v. *Ritchie*, supra, 480 U.S. 56. Conversely, if the excluded evidence was not central to a theory advanced by the defendant or to a critical issue in the case, or if its substance was, or could have been, presented to the jury by other means, the defendant's constitutional right to present a defense was not violated. See *State* v. *Leniart*, supra, 198 Conn. App. 603–604.

Our analysis begins with an examination of the theories presented by the state and the defendant at trial to determine the fundamental components of the defendant's misidentification defense. The state's theory of the case was that the defendant was the perpetrator based on the facts that he identified himself as the person in the still images of the perpetrator from the video that had been shown to him by Merriam and that Sarbieski did the same. In contrast, the defense's theory of the case was that the defendant and Sarbieski incorrectly had identified the defendant as the person in the still images of the perpetrator primarily on the basis that the perpetrator had tattoos and the defendant does not have tattoos, as indicated on the uniform arrest report. The defendant also sought to admit, through the uniform arrest report, evidence pertaining to his height

and weight, which could have been used to contradict testimony of witnesses describing the height and weight of the perpetrator. It follows, therefore, that evidence pertaining to those factors—height, weight, and tattoos—was central to a critical issue in the case, namely, the identity of the defendant as the perpetrator.

In the present case, the defendant sought to admit the uniform arrest report and testimony from Bobrowiecki relating to the report, which constituted the only evidence *offered by the defendant* to establish one of the fundamental components of his misidentification defense—that he does not have tattoos. See *State* v. *Wright*, supra, 320 Conn. 821 ("[m]ore troubling, the excluded testimony was the only evidence the defense presented to support its theory of the case"). Indeed, defense counsel stated to the court that "the tattoo status of [the defendant]" was "essential to the defense's case . . . ." See *State* v. *Smith*, 85 Conn. App. 96, 110–11, 856 A.2d 466 (2004) (recognizing that evidence that is "relevant and central to [a defendant's] claim that he was misidentified as the complainant's attacker . . . is crucial to his defense" (citation omitted)), aff'd, 280 Conn. 285, 907 A.2d 73 (2006); see also *State* v. *Timothy C.*, 237 W. Va. 435, 445, 787 S.E.2d 888 (2016) (court's exclusion of "identity-related" evidence violated defendant's right to present defense "because [his] defense was his innocence," and, therefore, excluded evidence "was critical to his defense").

Indeed, in *State* v. *Cerreta*, supra, 260 Conn. 251, our Supreme Court held that an erroneous evidentiary ruling amounted to a constitutional violation under circumstances similar to those of the present case. Id., 264. In *Cerreta*, which involved a killing during a home invasion, the defendant raised a third-party culpability defense and "attempted to present to the jury evidence that the police had found hair and fingerprints at the crime scene that did not belong to the defendant." Id.,

262. After first determining that the trial court's exclusion of the evidence as irrelevant was improper because the evidence "was exculpatory and probative"; id.; our Supreme Court held that the erroneous ruling was constitutional in nature because "[t]he excluded evidence not only was relevant to the primary issue at trial, namely, the identity of the perpetrator, it was central to the defendant's claim of innocence . . . [and] was, in essence, the most compelling evidence available to the defendant and was crucial to his defense." Id., 264.

In the present case, the information pertaining to the defendant's appearance in the uniform arrest report was highly probative, material and potentially exculpatory, because if a juror had determined from the video and testimony offered that the perpetrator had tattoos, the existence of a uniform arrest report prepared by an independent party stating that the defendant does not have tattoos could have " 'create[d] a reasonable doubt [about the defendant's guilt] that did not otherwise exist . . . .' " *Miller* v. *Angliker*, 4 Conn. App. 406, 421, 494 A.2d 1226, cert. denied, 197 Conn. 809, 499 A.2d 59 (1985), quoting *United States* v. *Agurs*, 427 U.S. 97, 112, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976). Lastly, the record suggests that the excluded evidence was the most compelling evidence available to the defendant to establish this element of his defense, as, by all indications, it was the only evidence from an independent, objective party that the defendant could have offered at trial concerning his appearance closer to the time of the incident. See *State* v. *Wright*, supra, 320 Conn. 821; *State* v. *Cerreta*, supra, 260 Conn. 264–65.

Consequently, the court's exclusion of the uniform arrest report hindered the defendant's ability to present his misidentification defense. As a result, the defendant presented an incomplete defense, and his ability to put the key aspect of his misidentification theory before

the jury was relegated to references during closing argument to testimony from Sarbieski, a witness for the state who had a connection to the defendant. See *Kos* v. *Lawrence + Memorial Hospital*, 334 Conn. 823, 843, 225 A.3d 261 (2020) (statements made by counsel during closing argument are not evidence). That is contrary to the principle that the constitutional right to present a defense "is the right to present the defendant's version of the facts . . . to the jury so that it may decide where the truth lies"; (internal quotation marks omitted) *State* v. *Torres*, supra, 343 Conn. 217; which entails a "meaningful opportunity to present a complete defense." (Internal quotation marks omitted.) *State* v. *Tony M.*, supra, 332 Conn. 831; see *People* v. *Cerda*, 40 N.Y.3d 369, 378, 223 N.E.3d 308, 199 N.Y.S.3d 887 (2023) (trial court's erroneous evidentiary ruling violated defendant's constitutional right to present defense because, "[b]y permitting defense counsel to suggest to the jury that there were alternative innocent explanations . . . yet excluding the most viable evidence to support that premise, the trial court's ruling deflated the strength of the defense").

There is one final issue we must examine in our determination of whether the exclusion of the evidence rose to the level of a constitutional violation. Specifically, our case law also directs that a court's erroneous ruling cannot be considered a constitutional violation of a defendant's right to present a defense if the defendant "failed to take steps to exercise the right or if he adequately has been permitted to present the defense by different means." (Internal quotation marks omitted.) *State* v. *Leniart*, supra, 198 Conn. App. 603–604; see *State* v. *Santana*, 313 Conn. 461, 471, 97 A.3d 963 (2014) (evidentiary claim was nonconstitutional because "the defendant could have pursued other avenues" to establish his third-party culpability defense); *State* v. *Osimanti*, 299 Conn. 1, 17, 6 A.3d 790 (2010) (evidentiary

claims were nonconstitutional because defendant was permitted to present other evidence to support defense theory).[15]

The record in the present case shows that the defendant took the steps necessary to exercise his right to present a defense, which, as discussed, requires that a defendant is permitted to present his "version of the facts . . . to the jury so that it may decide where the truth lies." (Internal quotation marks omitted.) *State* v. *Torres*, supra, 343 Conn. 217. The version of the facts that the defendant sought to present to the jury was simple—that he had been misidentified as the person

---

[15] In arguing on appeal that the defendant's claim is evidentiary in nature, the state has not asserted that the defendant "failed to take steps to exercise the right" or that "he adequately has been permitted to present the defense by different means." (Internal quotation marks omitted.) *State* v. *Leniart*, supra, 198 Conn. App. 603–604. Rather, the state merely contends that "the jury had before it ample evidence of the defendant's appearance at the time of the crime in the form of evidence from the video that the defendant was the individual in the video who assaulted the victim. As discussed . . . the jury had: (1) the surveillance video which showed the defendant punching the victim twice in the head; (2) the defendant himself at the trial; (3) the testimony of Merriam whom the defendant identified himself in front of; (4) the three photographs from the video that Merriam showed the defendant; (5) the testimony of [Sarbieski] who also identified the defendant from the same three photographs; (6) the testimony of three waitresses who were all present during the assault; and (7) Angeloni's identification of the defendant." We find no merit to this contention.

First, the state's argument that the jury had evidence of the defendant's appearance from the video of the perpetrator or the photographs taken from the video presumes that the defendant is the perpetrator. Second, the prosecutor specifically pointed out to the jury that four and one-half years had passed since the incident and that, because "[p]eople change in time" and the video was from four and one-half years ago, the jurors should look at the defendant's face and commit it to memory, as "[t]he [COVID-19] pandemic thirty was a real thing," which suggested that the defendant's appearance may have changed due to significant weight gain during the COVID-19 pandemic. Moreover, two of the three waitresses gave descriptions of the perpetrator, and all three testified that the defendant was not the perpetrator. Angeloni did not identify the defendant as the perpetrator; on the contrary, she testified that she saw the perpetrator, that the perpetrator was not the defendant, and that she otherwise could not describe the perpetrator.

who assaulted the victim. The defendant attempted to present this version of the facts by offering the uniform arrest report into evidence through the testimony of Bobrowiecki.

Moreover, nothing in the record indicates that there were other means by which the defendant adequately was permitted to present his misidentification defense.[16] The uniform arrest report was the only independent documentary evidence that was offered at trial showing the defendant's height and weight and that he did not have tattoos, at least at the time he was arrested. See *Scrimo* v. *Lee*, 935 F.3d 103, 120 (2d Cir. 2019) (defendant "was deprived of his constitutional right to present a complete defense" because "[i]n circumstances in which . . . the marginal evidence pointing to the defendant over another person is flimsy, and *the excluded evidence was the only independent source of facts essential to proving the defense's theory that the other person committed the crime*, we must conclude that the wrongfully excluded testimony would have introduced reasonable doubt where none otherwise existed" (emphasis added)). The fact that Sarbieski testified, during the state's case-in-chief, that the defendant did not have tattoos, by itself, cannot be construed as adequate other means by which to present the defendant's theory of defense. Sarbieski was the defendant's long-standing employer and, as the prosecutor pointed out to the jury, a "good friend" of the defendant. His testimony about the defendant's lack of tattoos, as juxtaposed against evidence from an objective and independent third party, the uniform arrest report, was not evidence of equivalent value to the defendant. See *State* v. *Osimanti*, supra, 299 Conn. 17 (exclusion of evidence of

---

[16] We note that there is nothing in the record indicating that the jury was otherwise able to view the defendant's forearms at trial, that is, whether, for example, the defendant wore short sleeves, and the state has not briefed any such claim on appeal.

victim's conviction for violation of protective order and of inquiry into victim's history of domestic violence, which was offered to prove victim's "violent character," when defendant claimed self-defense, was nonconstitutional because defendant "was able to introduce evidence to that effect in the form of the victim's lengthy criminal record and gang affiliations, as well as through his cross-examination of [a witness]"); *State* v. *Papineau*, 182 Conn. App. 756, 780–82, 190 A.3d 913 (exclusion of testimony from defendant's mother concerning innocent explanation for defendant's flight—that prior to crime, he planned to travel to Massachusetts—was not constitutional in nature because "the defendant was permitted to present evidence that he had preexisting plans to travel to [Massachusetts] by means other than the narrow inquiry that was excluded," namely, through testimony of two other witnesses), cert. denied, 330 Conn. 916, 193 A.3d 1212 (2018). Therefore, we cannot conclude that the defendant was adequately permitted to present his misidentification defense through the evidence that was admitted at trial.

In sum, no reasonable review of the record could lead to the conclusion that the defendant was "adequately . . . permitted"; (internal quotation marks omitted) *State* v. *Leniart*, supra, 198 Conn. App. 604; "a meaningful opportunity to present a complete defense"; (internal quotation marks omitted) *State* v. *Cerreta*, supra, 260 Conn. 260; as the court prevented him from presenting relevant and material evidence that supported his version of the facts, that he considered to be "essential" to his misidentification theory of defense, and that was central to the critical issue of identity. See *State* v. *Torres*, supra, 343 Conn. 217; *State* v. *Cerreta*, supra, 264–65. Accordingly, we are convinced that the court's erroneous exclusion of the uniform arrest report rose to the level of a constitutional violation, as it resulted in the exclusion of evidence that was material

to the central issue of identity and to the defendant's defense of misidentification.

III

Because we have determined that the court's exclusion of the proffered evidence constituted an abuse of discretion that is of constitutional magnitude, we next must "consider whether the exclusion of the evidence was harmless beyond a reasonable doubt" to determine whether a new trial is warranted. *State* v. *Wright*, supra, 320 Conn. 825. In such cases, "the state has the burden of proving the constitutional error was harmless beyond a reasonable doubt. . . . Whether a constitutional violation is harmless in a particular case depends upon the totality of the evidence presented at trial. . . . If the evidence may have had a tendency to influence the judgment of the jury, it cannot be considered harmless." (Citation omitted; internal quotation marks omitted.) *State* v. *Carpenter*, 275 Conn. 785, 832, 882 A.2d 604 (2005), cert. denied, 547 U.S. 1025, 126 S. Ct. 1578, 164 L. Ed. 2d 309 (2006).

The state argues that the court's erroneous ruling was harmless because "any relevance to the defendant's physical description in the arrest report was slight and would likely have been inconsequential because the jury had before it ample evidence of the defendant's appearance at the time of the crime in the form of evidence from the video," which shows the perpetrator of the crimes. This argument presumes that the defendant is the person depicted in the video. See footnote 15 of this opinion. Therefore, the state asserts that "[t]he proffered evidence . . . would not have strengthened the defense's case or weakened the state's case in any appreciable way due to the ample evidence the jury had before it on the identity of the suspect." We conclude that the state has not met its burden of demonstrating harmless error.

An appellate court "cannot hold a constitutional violation harmless unless [it is] 'able to declare a belief that it was harmless beyond a reasonable doubt.' " *State* v. *Cerreta*, supra, 260 Conn. 265. That is to say, it must appear "beyond a reasonable doubt that the [error] complained of did not contribute to the verdict obtained. . . . If the evidence may have had a tendency to influence the judgment of the jury, it cannot be considered harmless. . . . That determination must be made in light of the entire record [including the strength of the state's case without the evidence admitted in error]. . . . Additional factors that [our Supreme Court has] considered in determining whether an error is harmless in a particular case include the importance of the challenged evidence to the [defendant's] case, whether it is cumulative, the extent of cross-examination permitted, and the presence or absence of corroborating or contradicting evidence or testimony. . . . In other words, we [must be] satisfied beyond a reasonable doubt that the result would be the same without the admission of the assumedly improper evidence. . . . This inquiry is an objective one and requires us to consider the quality and quantity of both the inadmissible evidence and the admissible evidence that remains to support the verdict of the jury." (Citations omitted; internal quotation marks omitted.) *State* v. *Sayles*, 348 Conn. 669, 682–83, 310 A.3d 929 (2024); see also *State* v. *Sweet*, 214 Conn. App. 679, 698, 280 A.3d 1243 ("[t]his court has held in a number of cases that when there is independent overwhelming evidence of guilt, a constitutional error would be rendered harmless beyond a reasonable doubt" (internal quotation marks omitted)), cert. denied, 345 Conn. 920, 284 A.3d 983 (2022).

As case law indicates, when identity is a disputed issue, as in the present case, evidence of a person's appearance is not only relevant but is indeed highly material. See *State* v. *Smith*, supra, 85 Conn. App.

110–11; *State* v. *Reese*, supra, 77 Conn. App. 166; see also footnote 11 of this opinion. The state's assertion that any harm resulting from the exclusion of the evidence was inconsequential in light of the video, which it contends is strong evidence of the defendant's guilt, ignores the fact that the defendant's theory was that he was incorrectly identified as the person in the still photographs taken from the video. The video itself was not entirely clear, and, thus, it was not undisputed that the defendant was the person in the video. Moreover, the three waitresses who witnessed the assault at the restaurant all affirmatively testified that the defendant was not the perpetrator. Thus, in the present case, there was no "independent overwhelming evidence of guilt . . . ." (Internal quotation marks omitted.) *State* v. *Sweet*, supra, 214 Conn. App. 698. For this reason, any evidence tending to show a difference between the appearance of the defendant and the perpetrator captured in the video certainly could have affected the strength of the state's case and the defendant's defense, which, in turn, may have had a tendency to influence the jury's verdict. See *State* v. *Carpenter*, supra, 275 Conn. 832. Thus, evidence in the form of the uniform arrest report was of significant value to the defendant's defense because it constituted independent evidence concerning his appearance, as opposed to testimony from Sarbieski, who had a relationship with the defendant. For these same reasons, the uniform arrest report would not have been cumulative evidence. See *State* v. *Sayles*, supra, 348 Conn. 682–83.

In addition, the court's erroneous ruling excluded what was substantially the only evidence regarding the lack of tattoos *on the defendant* that the defendant sought to present in support of his defense of mistaken identity. See *State* v. *Wright*, supra, 320 Conn. 821. When a court's ruling results in the exclusion of essentially the only relevant evidence a defendant seeks to present

in support of his primary defense theory—and the evidence is material to a disputed issue in the case—it is not reasonable to believe that, had the defendant been permitted to introduce such evidence, it would not have had any tendency to influence the jury's verdict. For instance, if any juror deduced from his or her analysis of the video that the perpetrator had tattoos, the presence of a uniform arrest report stating that the defendant did not have tattoos may have created reasonable doubt with respect to the conclusion that the perpetrator in the video was the defendant, as opposed to the testimony from Sarbieski, which the jury could have discounted as being from someone who was partial to the defendant and which had no independent corroboration. The trial court's exclusion of the uniform arrest report deprived the defendant of a meaningful opportunity to present a complete defense of misidentification, and the jury should have been allowed to hear and assess the excluded information and to reach a verdict after weighing all the relevant evidence.

The present case is akin to *State* v. *Smith*, supra, 85 Conn. App. 96, in which this court held that the trial court's erroneous exclusion of evidence was a constitutional violation warranting reversal because "[t]he exclusion of the evidence . . . *interfere*[*d*] *with* [*the defendant's*] *right to use a defense of misidentification and, therefore, could not be harmless.*" (Emphasis added.) Id., 110. In *Smith*, this court reasoned that, "[w]hen the excluded evidence is relevant to the primary issue at trial, namely, the identity of the attacker, and central to the defendant's plea of not guilty and is the most compelling evidence available to the defendant, it is crucial to his defense, and the [exclusion] of such evidence conflicts with the defendant's right to present a defense." Id., 110–11. Those circumstances are analogous to the present case, in which the defendant's identity was the primary issue at trial, and in

which, as in *Smith*, "*the evidence the defendant sought to have admitted would not* [*have*] *exonerate*[*d*] *him unequivocally, but it would* [*have*] *be*[*en*] *relevant and central to his claim that he was misidentified as the complainant's attacker.*" (Emphasis added.) Id., 110. Thus, because the court's erroneous ruling in the present case interfered with the defendant's right to use his chosen defense of misidentification, we are unable to conclude that the court's error was harmless. See id., 110–11.

Finally, even though we do not address the defendant's prosecutorial impropriety claims[17] in light of our determination that the defendant was denied his constitutional right to present a defense and, thus, that a new trial is warranted, we nevertheless point out that, in assessing the harmfulness of the court's improper evidentiary ruling, we must view the entire record, which necessarily includes comments made by the prosecutor in rebuttal closing argument related to the defendant's appearance. See *State* v. *Hamilton*, supra, 352 Conn. 337–38 (our Supreme Court determined that trial court's improper admission into evidence of witness' two interviews with police, in which witness identified defendant as person in surveillance footage, was harmful and that conclusion was "buttressed by the way [the witness'] two interviews were used by the prosecutor during closing arguments"). The record shows that the prosecutor utilized testimony about the height, weight, and tattoos of the perpetrator in his closing argument to assert the state's position that the defendant's appearance matched that of the perpetrator and, further, suggested to the jury that it should not believe Sarbieski's testimony that the defendant does not have tattoos because the defendant is a good friend and employee of Sarbieski. In addition, the prosecutor specifically

---

[17] See footnote 18 of this opinion.

mentioned that the trial was taking place four and one-half years after the incident at the restaurant and that the jury should, thus, account for weight gain due to the COVID-19 pandemic, which occurred in the interim. Specifically, the prosecutor stated: "Four and a half years have passed since this incident, members of the jury. People change in time. I want you all to take a close look at [the defendant] now. Look at his face. Commit it to memory. *What you're looking at is not [the defendant] from 2018. You're looking at him now. The video is [the defendant] four and a half years ago. As [defense] counsel stated, we had a pandemic. The pandemic thirty was a real thing. Right? Some of us are still trying to take that weight off.*" (Emphasis added.)

Thus, despite the court's ruling *precluding the defendant* from introducing evidence concerning his height, weight and the existence of any tattoos six months after the incident, as set forth in the uniform arrest report, at the trial, which occurred more than four years after the incident, *the prosecutor* made comments that attempted to explain any difference in the appearance of the perpetrator in the video and the defendant's appearance at trial. See *People* v. *Cerda*, supra, 40 N.Y.3d 378 (when defendant was deprived of constitutional right to present defense, "[t]he prejudice . . . was compounded when the prosecutor emphasized to the jury on summation that evidence of such alternative theories 'doesn't exist,' despite knowing full well the findings in the precluded forensic reports"). Consequently, the harm resulting from the court's exclusion of the evidence, as we have outlined in this opinion, could only have been compounded by the prosecutor's remarks about the defendant's appearance, some of which were based on facts concerning the COVID-19 pandemic that were not in evidence.

Accordingly, for the foregoing reasons, the state has failed to meet its burden of demonstrating, beyond a reasonable doubt, that the court's error was harmless. We, therefore, conclude that the defendant is entitled to a new trial.[18]

The judgment is reversed and the case is remanded for a new trial.

In this opinion the other judges concurred.

———————————————

[18] "Generally speaking, if we reverse a judgment and remand the case for a new trial, we sometimes choose to review other claims that are likely to arise on retrial." *State* v. *Norman P.*, 169 Conn. App. 616, 618 n.2, 151 A.3d 877 (2016), aff'd, 329 Conn. 440, 186 A.3d 1143 (2018). We decline to address the defendant's prosecutorial impropriety claims, as well as his claim that the court improperly prohibited a defense witness from testifying due to late disclosure, as they are not likely to arise on remand. See *State* v. *Culbreath*, 340 Conn. 167, 199 n.18, 263 A.3d 350 (2021); *State* v. *Gordon*, 206 Conn. App. 70, 72, 259 A.3d 676, cert. granted, 339 Conn. 913, 262 A.3d 135 (2021) (appeal withdrawn April 8, 2022); *State* v. *Fernando V.*, 170 Conn. App. 44, 46 n.1, 153 A.3d 701 (2016), aff'd, 331 Conn. 201, 202 A.3d 350 (2019). The defendant's remaining evidentiary claims are that the court erroneously precluded the defendant from presenting testimony from an expert in video graphics and limited defense counsel's cross-examination of Nocera, a legal technology specialist, concerning the nature of metadata. The defendant sought to admit the testimony of those witnesses to help the jury to understand his theory of the case—that he had misidentified himself "due to the poor quality of the [photographs taken from the] video," which, itself, was of poor quality, "including, but not limited to, the low pixel rate, the low frame rate, the compression rate, the wipeout of certain colors, and the size of the camera's lens." We cannot say that these claims are likely to arise on retrial in light of our remand for a new trial and our determination that the court improperly excluded the uniform arrest report, as the evidentiary record on retrial may be different from the one before this court. See *State* v. *Robert R.*, 340 Conn. 69, 92, 262 A.3d 810 (2021); *State* v. *Jackson*, 334 Conn. 793, 822, 224 A.3d 886 (2020). We, therefore, decline to address these evidentiary claims.